**Claude E. HENSLEY, Individually, a citizen, voter, resident and taxpayer of Kenton County, Ky., et al., Plaintiffs,**

v.

**Albert T. WOOD, Kenton County Clerk, Commonwealth of Kentucky, Defendants,**
**Legislative Research Commission of the Commonwealth of Kentucky, Intervening Defendant.**

**No. 1581.**

United States District Court,
E. D. Kentucky,
Covington Division.

July 26, 1971.

Donald C. Wintersheimer, Covington, Ky., for plaintiffs.

Robert E. Ruberg, Covington, Ky., for Albert T. Wood.

Walter C. Herdman, Asst. Atty. Gen., Frankfort, Ky., for Com. of Ky.

Donald E. Harkins, Lexington, Ky., Thomas C. Carroll, Louisville, Ky., for Legislative Research Comm.

## MEMORANDUM

SWINFORD, District Judge.

Plaintiffs have instituted this suit for declaratory judgment to have the Commonwealth of Kentucky's current legislative district apportionment scheme enacted by the first extraordinary session of the 1971 General Assembly declared unconstitutional. Plaintiffs contend that certain of the State's House and Senate Districts are not properly represented because of impermissible population variances within those Districts. The 1970 federal census enumerated a population of 3,219,322 people for the State of Kentucky. Section 33 of the Constitution of the Commonwealth of Kentucky provides for 38 Senatorial Districts and 100 Representative Districts. The ideal house district for the State would therefore have a population of 32,193, while the ideal senate district would have a population of 84,719 persons. Subsequent to the 1970 federal census the first extraordinary session of the Kentucky General Assembly was convened for the purpose of reapportioning both of the Houses of that body. On March 24, 1971, House Bill 1 and Senate Bill 1 (the current legislative districting statute) became law without the signature of the Governor.

Under the present law 34 out of the 100 House Districts exceed the ideal district by 5% or more. The most overrepresented district is the 9th District which is comprised of a part of Christian County. The 9th District's population (28,104 persons) is 12.70% under that of the ideal district, or 4,089 persons less than the hypothetical ideal district of 32,193. The most underrepresented House District is the 5th District, which is 12.79% above the ideal house district. The population of the 5th House District, which is composed of Calloway and Trigg Counties, is 36,312 persons, or 4,119 more people than the ideal district would include. The total population difference from the most underrepresented District, the 5th, and the most overrepresented District, the 9th, is 8,208. The total percentage point difference between these two Districts as related to the ideal district is 25.49%. More than ⅓ of Kentucky's House Districts are under or over represented by more than 5%. Nearly ⅒ of the House Districts have a

population 10% or more above or below the ideal district.

Of the 38 Senate Districts, 9 exceed the ideal senatorial district (84,719) by 5% or more. The most overrepresented district is the 30th District which is made up of Woodford, Scott, Harrison, Bourbon, Nicholas, and part of Fayette Counties. The 30th District's population (78,828 persons) is 6.95% under the ideal district. In terms of people the 30th District has 5,891 less than would the ideal district of 84,719. The most underrepresented Senate District is the 21st District which includes Clay, Harlan, Laurel and Leslie Counties. The population of the 21st District is 94,860, or 10,141 more people than the ideal district would include. The 21st District is 11.97% over the ideal district. The total population difference between the 30th and 21st Districts is 16,032. The total percentage point difference between these two Districts as related to the ideal district is 18.92%. More than ¼ of Kentucky's Senate Districts are 5% or more above or below the ideal senatorial district for the State.

The average population deviation for each of the House Districts is 1,261 persons, or 3.917% above or below the ideal district. The total population deviations for all of the House Districts combined is 126,082 persons. The average population deviation for each of the Senate Districts is 2,996, or 3.536% above or below the ideal senatorial district. The total population deviations for all of the Senate Districts combined is 113,847 persons.

Although provisions in the Kentucky Constitution disallow multi-member districts it was decided in the District Court case of Upton v. Begley (Docket No. 346, Eastern District of Kentucky at Frankfort) that the prohibition in section 33 of the Constitution against the dividing of counties to make legislative districts was unconstitutional. Of the 100 House Districts of the current reapportionment plan, 20 include split counties. Of the 34 Senate Districts, 2 include split counties.

All of the House and Senate Districts are comprised of contiguous territory.

Alternative plans were offered and presented to the General Assembly for consideration. Several of these plans would have resulted in smaller population deviations than the present scheme. In fact the original draft of House Bill 1 and Senate Bill 1 had approximately ⅓ less total population deviations from the ideal districts for both the Senate and House than does the current law.

Judicial enforcement of either state or federal constitutional apportionment requirements has until recently been lacking at both the federal and state level for the reason that most courts have refused to meddle in what they considered to be strictly a legislative and political matter. Since 1962 the Supreme Court has decided several important apportionment cases. The present state of the law can best be understood by a cursory examination of these cases.

Perhaps the most significant of all apportionment cases decided by the Supreme Court is Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). In Baker the Court overruled its prior decision in Colegrove v. Green, 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432 (1946), and held that a claim of legislative malapportionment presented a justiciable question under the Equal Protection Clause of the Fourteenth Amendment of the Constitution of the United States. The Court in Colegrove refused to consider a malapportionment claim largely on the ground that such a question was essentially political in nature. Mr. Justice Frankfurter's opinion included the following language:

"It is hostile to a democratic system to involve the judiciary in the politics of the people. And it is not less pernicious if such judicial intervention in an essentially political contest be dressed up in the abstract phrases of the law. * * *

"The one stark fact that emerges from a study of the history of Congression-

al apportionment is its embroilment in politics, in the sense of party contests and party interests. * * *

"Courts ought not to enter this political thicket. * * * The Constitution has many commands that are not enforceable by courts because they clearly fall outside the conditions and purposes that circumscribe judicial action."

The Court, in Baker, unequivocally abandoned the posture which it had assumed in Colegrove. Speaking through Mr. Justice Brennan the Court stated that:

" * * * the mere fact that the suit seeks protection of a political right does not mean it presents a political question. * * * Appellants' claim that they are being denied equal protection is justiciable, and if discrimination is sufficiently shown, the right to relief under the equal protection clause is not diminished by the fact that the discrimination relates to political rights."

The jurisdictional groundwork for apportionment cases having been laid in Baker, the "one man one vote" rule and the "as nearly as practicable" equality of population standard were set out in Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964). The Supreme Court in Wesberry concluded that:

" * * * construed in its historical context, the command of Art. I, § 2, that Representatives be chosen 'by the People of the several States' means that as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's."

Although the Equal Protection Clause of the Fourteenth Amendment was held in Baker to offer a suitable remedy to correct malapportioned state legislative districts, this principle was more firmly established in Reynolds v. Sims, 377 U. S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), where the Court stated that "as a basic constitutional standard, the Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis." The fundamental rationale of all apportionment cases is perhaps best stated in the Reynolds opinion:

"Logically, in a society ostensibly grounded on representative government, it would seem reasonable that a majority of the people of a State could elect a majority of that State's legislators. To conclude differently, and to sanction minority control of state legislative bodies, would appear to deny majority rights in a way that far surpasses any possible denial of minority rights that might otherwise be thought to result. Since legislatures are responsible for enacting laws by which all citizens are to be governed, they should be bodies which are collectively responsive to the popular will. And the concept of equal protection has been traditionally viewed as requiring the uniform treatment of persons standing in the same relation to the governmental action questioned or challenged."

Despite unambiguous language in the Reynolds decision to the effect that populations between legislative districts must be, as nearly as practicable, equal, and that the primary concern of the legislators must be people rather than geographical or political considerations, the Court reasoned that some divergences from a strict population standard would be permissible so long as those divergences were based on "legitimate considerations incident to the effectuation of a rational state policy." The Court also noted that a State could legitimately desire to maintain the integrity of various political subdivisions and provide for districts of contiguous territory in designing a legislative apportionment scheme. It was additionally observed that what may be satisfactory or marginally permissible for one State would not necessarily be adequate for another.

In summary, the early apportionment decisions of the Supreme Court of the last decade have established three basic principles; 1) malapportionment claims present justiciable questions, 2) the

Equal Protection Clause provides manageable standards for lower courts to decide the constitutionality of a State's legislative apportionment scheme, and 3) one man's vote must as nearly as practicable, equal in weight the vote of any other citizen in the State.

Possibly the most difficult problem in designing legislative apportionment schemes is in attempting to recognize political subdivisions, while at the same time attempting to create mathematical precise districts. Frequently these two things are neither reconcilable nor compatible. As a consequence some variances are permissible if a compelling need can be shown therefor. In Swann v. Adams, 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967), the Supreme Court reversed the District Court's holding that Florida's apportionment scheme was constitutional. The population variances ranged from 15.09% overrepresentation to 10.56% underrepresentation in the Senate Districts, and from 18.28% overrepresentation to 15.27% underrepresentation in the House Districts. The Court held that, despite the constitutionality of some divergences under exigent circumstances, the State had not, and, apparently could not articulate acceptable reasons for the population disparities within the House and Senate Districts. The opinion of the Court recognized the impracticability of achieving mathematically precise districts, but stated that total variations of 30% among the Senate Districts and 40% among the House Districts could not be considered *de minimus*. It was perhaps the reference to *de minimus* deviations in the Swann case upon which the appellants in Kirkpatrick v. Preisler, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969), and Wells v. Rockefeller, 394 U.S. 542, 89 S.Ct. 1234, 22 L.Ed.2d 535 (1969), based their cases. In Kirkpatrick the redistricting scheme for Missouri's congressional seats showed population variances of only 3.-13% and 2.48%. The appellants argued that the deviations were so small that they should be considered *de minimus*. The majority opinion of the Court made it perfectly clear that there was no numerical percentage small enough to be considered *de minimus* and therefore allowable. The whole purpose of the "as nearly as practicable" standard, the Court reasoned, was to prevent the adoption of permissible fixed numerical variances. The States are, the Court concluded, required to make good faith efforts to achieve precise mathematical equality and are also required to justify any remaining population disparity no matter how small. The virtue of the rigid standards defined in Kirkpatrick is open to serious question. The dissenters unanimously agreed that such an inflexible mathematical standard was totally impractical due to the transient nature of many citizens and due to the likelihood of significant errors in census enumerations. Even if precise districts were possible, the composition of those districts is more likely than not bound to change in a monumental way before the next census. Mathematical precision, if achieved, is destined to an ephemeral existence. The net result of the Kirkpatrick decision was to exacerbate legislators' problems in attempting to create mathematically proper districts which are also, and perhaps more importantly, based on geographical circumstances and traditional political subdivisions.

A withdrawal or at least a partial retreat from the somewhat inflexible standards expounded in Kirkpatrick may be evinced by one of the most recent Supreme Court decisions concerning apportionment questions. In Abate v. Mundt, 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971), the Supreme Court concluded that an apportionment plan for Rockland County, New York is constitutional even though it has a total deviation from population equality of 11.9%. (The total population deviation from population equality for the congressional districts in the Kirkpatrick case was only 5.97%.) The opinion of the Court which affirmed the principles set out in Reynolds v. Sims, and subsequent cases, although no mention of Kirkpatrick was made, stated that "the particular circumstances and

needs of a local community as a whole may sometimes justify departures from strict equality". The opinion also stated, citing Reynolds v. Sims, "that a desire to preserve the integrity of political subdivision may justify an apportionment plan which departs from numerical equality." The Court, however, qualified its decision by saying that " * * * Nothing we say today should be taken to imply that even these factors could justify substantially greater deviations from population equality." It is not clear where the "as nearly as practicable" standard so narrowly defined in Kirkpatrick stands after the Abate decision, but it can be fairly assumed that the trend, if not the law, is that the integrity of political subdivisions does not have to be blindly sacrificed to mathematical precision.

■■■ Without regard for whatever may be presaged by the recent Supreme Court rulings, the criteria to be followed by the States and applied by the courts as extrapolated from the above cases are: 1) regardless of the legitimate desire to preserve the integrity of political subdivisions, the primary concern of the legislators must be the equal weight of each citizen's vote; 2) some divergences from population equality are permissible if they are founded on legitimate considerations incident to the effectuation of a rational state policy; and 3) if it is shown that there are population variances and if it is further shown that more precise alternative plans could be adopted, then the State must articulate acceptable reasons for the scheme which it has enacted.

■■ The court concludes that the Kentucky General Assembly has made a good faith effort to achieve politically non-discriminatory legislative districts, but has failed to heed the one inexorable mandate the Supreme Court has expressed in each of its opinions since Baker; that the paramount concern of the legislators in fashioning legislative districts must be population equality. It is clear from the evidence adduced that the legislators, honorable intentions not-

withstanding, made a value judgment that political sentiments and traditional political subdivisions were more important in certain instances than mathematically pure districts. Although the case law states that unavoidable divergences may be permissible if based upon legitimate concerns, one of which is the integrity of political subdivisions, no where has the Supreme Court stated that apportionment problems may be approached with the primary intention of preserving county lines. The legislators must not start from the premise that justifiable variances may be made, and then proceed to purposely make mathematically impure districts, believing that they may be justified. Rather, the legislators must attempt to make each district mathematically precise; if however, population deviations are unavoidable, then they may, under critical circumstances, be justified. It is apparent that the only variations from population equality which the case decisions of the Supreme Court permit, although less stringent rulings may be in the offing, are those which are unavoidable. In Reynolds v. Sims, the Court stated that:

"Whatever the means of accomplishment, the overriding objective must be substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the State."

In Kirkpatrick v. Preisler, the Court found that deviations smaller than those resulting from Kentucky's present law were unconstitutional primarily because they were not unavoidable. The Court stated:

"Clearly, the population variances among the Missouri congressional districts were not unavoidable. Indeed, it is not seriously contended that the Missouri Legislature came as close to equality as it might have come."

The court having concluded that the legislators purposefully sacrificed population equality between the districts in favor of traditional subdivisions, further concludes that the deviations resulting

from the current law cannot be justified. The intervening defendant has argued that there is no inflexible mathematical criteria by which the constitutionality of a reapportionment scheme can be measured, and has asserted that the present plan's variations are justified insomuch as the legislators attempted to achieve, and did achieve "effective representation" which recognizes county lines and other local governmental entities upon which the structure of Kentucky government is dependent. It is true that there is no inflexible mathematical criteria for determining the constitutionality of reapportionment schemes. It is not permissible for a State to arbitrarily select a certain percentage of population deviation and then strive to meet or at least not exceed that mathematical variation of population. This was conclusively established in Kirkpatrick v. Preisler. However, it was additionally established in Kirkpatrick that a State may not approach its redistricting problems from the standpoint of preventing the fragmentation of political subdivisions. The opinion of the Court in Kirkpatrick included the following excerpts:

> "Missouri contends that variances were necessary to avoid fragmenting areas with distinct economic and social interests and thereby diluting the effective representation of those interests in Congress. But to accept population variances, large or small, in order to create districts with specific interest orientations is antithetical to the basic premise of the constitutional command to provide equal representation for equal numbers of people. * * *

" 'The legislative leaders all testified that the act in question was in their opinion a reasonable legislative compromise * * * (and that) It must be remembered * * * that practical political problems are inherent in the enactment of congressional reapportionment legislation.' We agree with the District Court that 'the rule is one of practicability rather than political practicability.' * * * Problems created by partisan politics cannot justify an apportionment which does not otherwise pass constitutional muster.

"Similarly, we do not find legally acceptable the argument that variances are justified if they necessarily result from a State's attempt to avoid fragmenting political subdivisions by drawing congressional district lines along existing county, municipal, or other political subdivision boundaries."

The intervening defendant implies in its brief that there should be a distinction made between what is a permissible population variance for congressional districts and what is a permissible population variance for state legislative districts. Although it may appear from the cases that state legislative districts have been allowed greater population deviations than congressional districts, this court is unable to find any statement in any Supreme Court opinion to the effect that the Constitution requires less mathematical precision as to state legislative districts than it does in regard to federal congressional districts.[*] If States have been allowed greater population deviations in their legislative districts it is more than likely coincidental. In fact

---

[*] In Reynolds v. Sims, the Supreme Court suggested that:

"Since, almost invariably, there is a significantly larger number of seats in state legislative bodies to be distributed within a State than congressional seats, it may be feasible to use political subdivision lines to a greater extent in establishing state legislative districts than in congressional districting while still affording adequate representation to all parts of the State. To do so would be constitutionally valid, so long as the resulting apportionment was one based substantially on population and the equal-population principle was not diluted in any significant way.

"Somewhat more flexibility may therefore be constitutionally permissible with respect to state legislative apportionment than in congressional districting."

These statements, although seemingly authority for the intervening defendant's proposition are merely dicta, and should

the Supreme Court stated in Maryland Committee for Fair Representation v. Tawes, 377 U.S. 656, 84 S.Ct. 1429, 12 L.Ed.2d 595 (1964), that " * * *, in determining the validity of a State's apportionment plan, the same federal constitutional standards are applicable * * *".

It may be valid to suggest that Abate v. Mundt, 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971), foreshadows a mollification in the rigid requirements heretofore declared by the Supreme Court. In Abate, total deviations of 11.9% were held constitutional for the stated reason that the "needs of a local community as a whole may sometimes justify departures from strict equality". The Court added that it should not be insinuated that "these factors could justify substantially greater deviations from population equality". As stated above the total extreme deviation from population equality for Kentucky's House Districts is 25.-49%, while the total deviation for the Senate Districts is 18.92%.

■ In addition to the intervening defendant's argument that the population variations are justified because of the legislators' desire to preserve county lines and geographical boundaries (an argument which this court feels is unacceptable in light of the fact that more precise plans were offered), the intervening defendant argues, as to two of the State's most overrepresented House Districts, Districts 8 and 9, each of which have populations 12% below the ideal district, that the return of the 173rd Army Airborne Division to the military installation located in the county including these districts will nullify any existing inequality. Ironically, it is possible that the return of the 173rd Airborne Division would create a greater population inequality than had theretofore existed, however, despite what will or might occur, the Supreme Court rejected in Kirkpatrick the appellant's attempt to explain away notable population deviations because of the presence or absence of a military base or university. It is not permissible to attempt to justify a population disparity in one district by speculations that that district's population will equalize itself in the future, unless such a prediction can be made with a high degree of accuracy and unless similar predictions are made for every other district in the State.

It is the conclusion of the court that the present reapportionment scheme in Kentucky is unconstitutional. While the court realizes the problems with which the legislators had to grapple; is mindful of the fact that Kentucky has the highest ratio of counties to population of any other state; and concurs with Dr. Jewell's testimony that the continued fragmentation of county lines in pursuit of equal districts will eventually result in wholly ineffective representation, the court is satisfied that the present act is not constitutional and that acceptable reasons have not been articulated for the population deviations within it. It is

not be accepted as a reason for a State's refusal to adhere as closely as possible to constitutional requirements. The above excerpts were qualified by the following language:

"Lower courts can and assuredly will work out more concrete and specific standards for evaluating state legislative apportionment schemes in the context of actual litigation. For the present, we deem it expedient not to attempt to spell out any precise constitutional tests. What is marginally permissible in one State may be unsatisfactory in another, depending on the particular circumstances of the cases.

"Whatever the means of accomplishment, the overriding objective must be substantial equality of population." (Emphasis added.)

This court knows of no precise standard for state legislative districts having been spelled out. The lower courts consistently employ the "as nearly as practicable" standard, which is applicable to both congressional and state legislative districts. In a case decided the same day as Reynolds v. Sims, the Court stated:

" * * *, in determining the validity of a State's apportionment plan, the same federal constitutional standards are applicable * * *" Maryland Committee for Fair Representation v. Tawes, 377 U.S. 656, 84 S.Ct. 1429, 12 L.Ed.2d 595 (1964).

true that the population variances for Kentucky's legislative districts are perhaps not as egregious as were the deviations within many of the state plans that have been held to be constitutionally infirm, but this fact is in reality irrelevant. It is only important that there are substantial population inequalities, which the legislators have admitted could have been avoided, but which they chose to tolerate for reasons which this court feels are not, under the circumstance, acceptable.

The intervening defendant has suggested in its motion tendering alternative Findings of Fact and Conclusions of Law that only two of the Senate Districts be held unconstitutional, and that the remaining House and Senate Districts remain intact for the reason that acceptable arguments have been articulated for the population divergences within those districts. The intervening defendant's alternative conclusions do not take into account several of the House Districts which have even greater percentage point variations than the two Senate Districts which it has suggested could be ruled unconstitutional. Nonetheless the fundamental suggestion of the intervening defendant's alternative Findings of Fact and Conclusions of Law is well taken. Many of the House and Senate Districts vary as little as 1, 2 or 3% from the ideal district. These districts, the court believes, are constitutional under the circumstances of this case. The 1972 General Assembly may therefore only have to readjust as precisely as possible those districts having substantial deviations. However, it is not within this court's province at this time to order the legislature to make certain specific changes. The court may only rule upon the constitutionality of the act, as it has done, and inform the legislature of this ruling and hope that it will be able to enact a scheme which more accurately complies with the "one man one vote" rule and the "as nearly as practicable" standard.

 State primary elections have already been held under the present law, and the general election for the nominees chosen in the primary is scheduled for this November. It is clear that an additional Special Session of the General Assembly would not have sufficient time to consider and adopt a new plan. The court therefore directs that those persons nominated under the present statute be allowed to run in the fall election, and that the fall election be administered under the present law. Those persons elected this fall will be allowed to represent their constituents as circumscribed by the present reapportionment. The ruling of this court will be communicated to the 1972 General Assembly, during which it is hoped that a constitutional act can be passed. There is ample authority to the effect that impending elections may be administered under a reapportionment law which has been found unconstitutional. In Reynolds v. Sims, the Court noted that:

"* * * under certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme was found invalid."

In Kilgarlin v. Hill, 386 U.S. 120, 87 S.Ct. 820, 17 L.Ed.2d 771 (1967), the Supreme Court affirmed the District Court's action in permitting the 1966 state election in Texas to proceed under H.B. 195, although that plan was constitutionally infirm in certain respects. More recently the Supreme Court held in Ely v. Klahr, 403 U.S. 108, 91 S.Ct. 1803, 29 L.Ed.2d 352 (1971), that it is permissible for a District Court to refuse to enjoin the enforcement of a reapportionment scheme which it has held unconstitutional, where there is an impending election.

It is the summary conclusion of the court that the population deviations resulting from Kentucky's present reapportionment law are in violation of the "one man one vote" principle, and do not measure up to the "as nearly as practicable"

standard. Acceptable reasons have not been articulated for these deviations. Because of the imminent election, those nominees chosen in May will be allowed to run, and if victorious, hold office under the present plan. An order in conformity with the reasons and authority expressed in this memorandum will this day be entered.

## ORDER

It is ordered that Chapter Two of the legislation enacted by the First Extraordinary Session of the Kentucky General Assembly of 1971, relating to the reapportionment of State Senate and House Legislative Districts be and the same hereby is declared unconstitutional.

It is further ordered that the impending November election be allowed to proceed under the current Act. The nominees chosen in May of this year will be allowed to run, and if victorious, hold office under the current Act.

Findings of Fact and Conclusions of Law as required by Rule 52(a) of the Federal Rules of Civil Procedure are stated within the court's memorandum opinion filed herewith.