Joseph M. FISCHER, Appellant,

v.

STATE BOARD OF ELECTIONS; Bob Babbage, Secretary of State; Campbell County Board of Elections; Jack Snodgrass, Campbell County Clerk, Appellees.

No. 93–SC–807–TG.

Supreme Court of Kentucky.

June 23, 1994.

Joseph M. Fischer, II, Ft. Thomas, for appellant.

Chris Gorman, Atty. Gen., Lynne Schroering, Asst. Atty. Gen., Civ. Div., Frankfort, for appellees, State Bd. of Elections and Secretary of State.

Paul H. Twehues, Jr., Campbell County Atty., Newport, for appellees, Campbell County Bd. of Elections, and Jack Snodgrass, Campbell County Clerk.

LAMBERT, Justice.

This appeal is from the judgment of the Campbell Circuit Court which upheld the constitutionality of the 1991 Legislative Reapportionment Act (as amended effective January 1, 1993), KRS Chapter 5. The issue is whether the Act satisfies the mandate of Section 33 of the Constitution of Kentucky and in particular that portion which prohibits the division of counties between or among legislative districts. As this issue is of "great and immediate public importance," we granted transfer. CR 74.02.

This review is undertaken in the spirit of *Rose v. Council for Better Educ., Inc.*, Ky., 790 S.W.2d 186, (1989), wherein we reiterated the strong presumption in favor of the constitutionality of acts of the General Assembly and declared our reluctance to interfere in matters of legislative discretion, the foregoing in obedience to Sections 27, 28 and 29 of the Constitution of Kentucky which fully preserve the separation of governmental power.[1] In *Rose*, we nevertheless recognized that we must apply the Constitution, even to declare the failure of the General Assembly to discharge its constitutional duty, for to do otherwise would breach the social compact which binds us one to another and would amount to an abdication of judicial

---

1. Our decision in *Legislative Research Com. by Prather v. Brown*, Ky., 664 S.W.2d 907 (1984), is authoritative on the separation of powers doctrine and demonstrates our commitment to the prevention of trespass by one branch of government upon the constitutional authority of another.

responsibility. In a compelling statement of constitutional principle, we said:

> The judiciary has the ultimate power, and the duty, to apply, interpret, define, construe all words, phrases, sentences and sections of the Kentucky Constitution as necessitated by the controversies before it. It is *solely* the function of the judiciary to do so. This duty must be exercised even when such action serves as a check on the activities of another branch of government or when the court's view of the constitution is contrary to that of other branches, or even that of the public.

*Rose,* 790 S.W.2d at 208. Any doubt as to this Court's right and duty to review the constitutionality of legislative apportionment was long ago laid to rest in *Ragland v. Anderson,* 125 Ky. 141, 100 S.W. 865 (1907):

> [N]o matter how distasteful it may be for the judiciary to review the acts of a co-ordinate branch of the government their duty under their oath of office is imperative.

*Id.,* 100 S.W. at 867. *See also Stiglitz v. Schardien,* 239 Ky. 799, 40 S.W.2d 315 (1931), and *Combs v. Matthews,* Ky., 364 S.W.2d 647 (1963).

Appellant, pro se, brought this action for declaratory and injunctive relief and sought the court's judgment that the Reapportionment Act of 1991 was in violation of Section 33 of the Constitution of Kentucky. The essential evidence was stipulated and the trial court's findings of fact are not challenged. As found by the trial court, the Act apportions the House of Representatives into one hundred districts which contain a population deviation range of −4.97% to +4.94% from the ideal district population of 36,853. By the Act, forty-eight counties are divided. The trial court found that an alternative

House apportionment plan[2] would have resulted in a population deviation of −4.95% to +5.00% with only twenty-nine counties divided. Thus, by an increase of 0.04% in the population deviation range, division of nineteen fewer counties could have been accomplished.

Likewise, as found by the trial court, the Act apportions the Senate into thirty-eight districts which contain a deviation range of −3.26% to +3.09% from the ideal district population of 96,981. By the Act, nineteen counties are divided. The alternative Senate apportionment plan[3] would have resulted in a population deviation of −4.74% to +4.79% with only five counties being divided. Thus, by an increase of 3.18% in the population deviation range, division of fourteen fewer counties could have been accomplished.

Despite its factual findings as set forth hereinabove, the trial court upheld the constitutionality of the Act. For its conclusion, the court acknowledged the competing constitutional concepts of equality of district population without unnecessary division of counties,[4] but gave its highest priority to population equality and relegated county integrity to a decidedly diminished status. Among other things, the trial court considered "various political factors" such as "community of interest, voter registration, voter participation habits, and residence of incumbent legislators" as valid in the reapportionment paradigm. The trial court concluded that population equality was mandated and held that it could not be diminished to achieve any other constitutional objective.

> Population equality may not be sacrificed in order to achieve another objective, whether that objective be restricting the number of counties that may be grouped

---

2. The alternative plan was not introduced during the 1991 extraordinary session during which the Act was adopted. It was introduced by Senator Art Schmidt during the 1992 regular session of the Kentucky General Assembly as Senate Bill 125 and Senate Bill 126. Our references to this alternative plan should not be understood as any endorsement thereof. However, it was found by the trial court to be a viable alternative to the Reapportionment Act and shows the availability of a plan which would have resulted in substantially fewer divided counties.

3. *Id.*

4. No question has been raised as to the requirement that counties which form legislative districts be contiguous. Section 33 of the Constitution of Kentucky expressly requires that "the counties which form a district shall be contiguous" and we regard this requirement as immutable.

together or reducing the number of counties that lie in two districts.

*Fischer v. State Board of Elections,* No. 91–CI–01400, slip op. at 5 (Campbell Circuit Sept. 28, 1993).

The relevant portion of the Constitution of Kentucky, Section 33, is as follows:

> The ... General Assembly ... shall divide the State into thirty-eight Senatorial Districts, and one hundred Representative Districts, as nearly equal in population as may be without dividing any county....

The foregoing language is uncomplicated and leads immediately to the conclusion that as between the competing concepts of population equality and county integrity, the latter is of at least equal importance. The probability of population inequality is acknowledged, but the command with respect to the division of any county is absolute. This construction is confirmed by an examination of the *Debates Constitutional Convention 1890.* Delegate Bronston was quoted on page 4423 as follows:

> It was the meaning of the section adopted by the Convention, that whatever ambiguity might cling, no county should be divided. I think that this convention is unanimous in that regard, that they do not want any county divided unless it is entitled to two representatives. In other words, we do not want one part of a county added to another for the purpose of securing representation.

Other portions of the *Debates* confirm this view and reveal a competition between urban and rural delegates with the compromise being that apportionment would be according to population as nearly as possible without the division of counties to achieve mathematical precision.

While the constitutional ink was yet barely dry, the 1906 session of the General Assembly enacted an apportionment plan which was truly extraordinary. At that time, an ideal House district had a population of 21,471, but some counties which had a population of less than one-half that number were given one representative while elsewhere multi-county districts were created which had a population of between 30,615 and 53,263. By the 1906 apportionment, a voter in Spencer County

exercised in the Legislature more than seven times the influence of a voter in Ohio, Butler or Edmonson counties. Holding such gross violation of the requirements of Section 33 unconstitutional, the Court in *Ragland v. Anderson,* 125 Ky. 141, 100 S.W. 865 (1907), declared that there must be equality of representation to the greatest extent practicable. The Court also held that nothing in Section 33 forbade the joinder of two counties to create one district for the purpose of achieving population equality. *See Combs v. Matthews, supra.* Since its rendition, *Ragland* has been understood to require substantial equality of representation for all citizens of Kentucky, a requirement we reiterate herein.

A generation after *Ragland,* the Court revisited the issue of legislative apportionment in *Stiglitz v. Schardien,* 239 Ky. 799, 40 S.W.2d 315 (1931), wherein the constitutionality of the 1930 Reapportionment Act was challenged. According to the prevailing census, an ideal House district would have contained 24,166 citizens, but some districts had fewer than 15,000 while others had in excess of 50,000. Similar disparity prevailed in Senate districts. The Court noted that

> Twelve [House] districts entitled to but six are in fact given twelve representatives.... Twelve districts [were] given only twelve representatives instead of twenty-two, to which they were entitled.

*Id.* 40 S.W.2d at 318. Holding the apportionment unconstitutional, the Court concluded that no attempt had been made to comply with the constitutional requirement of population equality, but commented that exactitude was not to be expected.

> Approximation is the rule erected by the Constitution, but the Legislature may not escape its duty of approximation imposed by the Constitution on the ground that mathematical precision is not attainable.

*Id.* at 319.

The parties agree that *Ragland* and *Stiglitz* place primary emphasis upon population equality among legislative districts. They disagree as to the extent population equality should be controlling and the extent to which

the constitutional requirement with respect to division of counties should be sacrificed.

■ Prior to addressing the state constitutional issue presented, it is necessary to briefly discuss federal authority in the arena of legislative apportionment. This is not because appellant makes any claim that the 1991 Reapportionment Act violates any provision of the United States Constitution. In fact, he admits that the Act would pass muster under the Constitution of the United States and relies entirely on Section 33 of the Constitution of Kentucky. It is important to note, however, that while controlling federal decisions require virtual perfection in the apportionment of Congressional districts, no such rule prevails with respect to the apportionment of state legislative districts. *Connor v. Finch,* 431 U.S. 407, 97 S.Ct. 1828, 52 L.Ed.2d 465 (1977); *Gaffney v. Cummings,* 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973); *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); and *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Federal decisional law has long acknowledged the right of states to allow significant deviation from strict "one man, one vote" principles, absent invidious discrimination, to achieve important state policy. A total deviation of 16.4% was upheld in *Mahan v. Howell,* 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973), on the grounds that the State of Virginia had a substantial interest in preserving the integrity of its political subdivisions. Likewise, a total deviation of 89% was upheld in *Brown v. Thomson,* 462 U.S. 835, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983), "on the basis of Wyoming's longstanding and legitimate policy of preserving county boundaries." While the federal courts have not abdicated their duty to require compliance with the Constitution of the United States in matters of state legislative apportionment, a presumption of validity has emerged and it is safe to say that so long as the maximum population deviation does not exceed −5% to +5%, and provided any such deviation is in furtherance of state policy, no violation of the Constitution of the United States will be found. *Gaffney v. Cummings, supra,* and *Connor v. Finch, supra.*

■ The dominant political subdivision in Kentucky is the county. Our Commonwealth was the fifteenth state and the first state west of the Alleghenies. Kentucky was settled by pioneers who entered our rugged mountains through Cumberland Gap or came to our flatlands on the Ohio River. The pioneers were fiercely independent and settled in remote enclaves which were often distant from and inaccessible to one another. Kentucky had three original counties, Jefferson, Fayette and Lincoln. From these three, and for the next 132 years, additional counties were formed, generally along natural or historical boundary lines, until the total reached 120. The need for so many counties in our state may be explained by the necessity for farmers, miners and loggers to have access to the county seat on horseback or by wagon and return home in a single day. While this need has become diminished by virtue of modern transportation, fierce county loyalty has been perpetuated from one generation to another.

Until recently, most Kentuckians have resided in rural areas, not in cities or towns, and until this day, many Kentuckians live in the country. For them, their primary political subdivision and point of geographic identity is their county. Nearby cities and even county seat towns are entirely secondary in terms of geo-political significance. Many students attend county-named schools, county government is primary for many Kentucky citizens, banks and other commercial enterprises use county names in their names, and every school child knows the name of his or her county from hearing its constant repetition by parents and teachers. Even members of the General Assembly are respectfully addressed and identified by the name of their home county. In substance and in form, the county unit is at the heart of economic, social and political life in Kentucky.

With this rich and compelling history of county identity, it is not surprising that the delegates to the Constitutional Convention of 1890 declared that legislative apportionment should be accomplished "without dividing any county." We have no doubt that in the minds of the delegates, sitting three-quarters

of a century before *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), preservation of county integrity was a paramount consideration. While any such view is now untenable, the total destruction of county integrity is not required and should be balanced with population equality to accommodate both.

Our sister state of Tennessee recently confronted the problem we face here. In 1981, its legislature enacted a reapportionment plan which achieved near mathematical perfection. The Act was challenged on grounds that it violated a state constitutional provision which provided that "no county shall be divided in forming such a district." Recognizing the requirement of equal apportionment, the court nevertheless invalidated the Act. Holding that preservation of county boundaries was of great importance, the court directed adoption of a plan which crossed as few county lines as possible within federal constitutional guidelines for equal representation. *State ex rel. Lockert v. Crowell*, 631 S.W.2d 702 (Tenn.1982). When the case returned to the Tennessee Supreme Court for review of the revised apportionment, the court approved a plan which provided for a total variance exceeding 13%, but which divided only three counties in the Senate and twenty-five counties in the House. *State ex rel. Lockert v. Crowell*, 656 S.W.2d 836 (Tenn.1983).

The Tennessee cases are highly persuasive. The relevant provisions of the Constitution of Tennessee and the Constitution of Kentucky are virtually indistinguishable, Tennessee and Kentucky are similar in size and population, they share a common boundary hundreds of miles long, are similar in their distribution of urban and rural population, have a common heritage, and were admitted to the Union about the same time. (Tennessee was admitted four years after Kentucky.)

There is no fundamental impediment to a full accommodation of the dual mandates of Section 33 of the Constitution of Kentucky.

Within reasonable limits, federal law is no barrier and our decisions in *Ragland* and *Stiglitz* do not command perfect population equality at the total expense of county integrity. Population equality under Section 33 may be satisfied by a variation which does not exceed $-5\%$ to $+5\%$ from an ideal legislative district. By simple arithmetic, and using the ideal district population figures relied upon by the General Assembly for the 1991 Reapportionment Act, this would mean that no House district could have fewer than 35,010 citizens nor more than 38,696 citizens, and no Senate district could have fewer than 92,132 citizens nor more than 101,830 citizens. Using these parameters, the General Assembly can formulate a plan which reduces to the minimum the number of counties which must be divided between legislative districts. One such plan was placed in evidence and there may be others which are equal or superior to it. The mandate of Section 33 is to make full use of the maximum constitutional population variation as set forth herein and divide the fewest possible number of counties.[5]

This opinion is not a relaxation of the principle of equal representation. We merely seek to restore the balance between competing constitutional concepts, a balance which was diminished or lost when the Court undertook to enforce equal legislative representation. While *Ragland* and *Stiglitz* use strong language, it is no wonder when one considers the state of affairs which then prevailed. The battle for population equality in representation is now over and the Constitution has prevailed. As evidence of this, we observe that no party has come forward in this lawsuit to contend that he or she is under-represented or victimized by invidious discrimination. At this juncture, we seek to restore the integrity of our most basic political subdivision and assure that natural and historic boundary lines are observed as intended by the Constitution.

In support of their argument directed to the merits of this case, appellees have cited

---

5. We recognize that the division of some counties is probable and have interpreted Section 33 to permit such division to achieve population requirements. However, we can scarcely conceive of a circumstance in which a county or part thereof which lacks sufficient population to constitute a district would be subjected to multiple divisions.

and rely on a 1971 unpublished decision of the United States District Court for the Eastern District of Kentucky, *Upton v. Begley* (Docket No. 364). This decision purports to declare unconstitutional under the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States, that portion of Section 33 of the Constitution of Kentucky which prohibits dividing any county in legislative apportionment. It is asserted that the General Assembly considered this opinion in formulating its reapportionment plan, thereby indicating its good faith. Appellant answers that this unpublished decision is erroneous, not binding on this Court, and that good faith is virtually irrelevant to the inquiry.

We agree with appellant that the *Upton* decision is erroneous. It failed entirely to take account of this Court's decisions in *Ragland v. Anderson*, 125 Ky. 141, 100 S.W. 865 (1907), *Stiglitz v. Schardien*, 239 Ky. 799, 40 S.W.2d 315 (1931), and *Combs v. Matthews*, Ky., 364 S.W.2d 647 (1963), which placed appropriate priority on equality of representation for all citizens. It also failed to properly apply then controlling federal authority, *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Of course, subsequent federal decisions which elaborate on the right of states to consider other important state law factors in the process of apportionment were not yet available. Whatever precedential value *Upton v. Begley* may ever have had has been seriously eroded by subsequent decisions of the Supreme Court of the United States.

In addition, *Upton v. Begley* appears to have been rendered in violation of the abstention doctrine exemplified in *Railroad Com. of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). This venerable doctrine of federal comity in favor of state law interpretation provides that where questions of state law may be dispositive of the case, federal courts should abstain from deciding if a statute (and surely a constitutional provision) is susceptible to a construction by the state judiciary which would eliminate the necessity of deciding on federal constitutional grounds. The correct procedure was outlined in *Wisconsin v. Constanti-*

*neau*, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971):

> In 1941 we gave vigor to the so-called abstention doctrine in *Railroad Commission v. Pullman Co.*, 312 U.S. 496, 85 L.Ed. 971, 61 S.Ct. 643. In that case an authoritative resolution of a knotty state law question might end the litigation and not give rise to any federal constitutional claim. *Id.*, at 501, 85 L.Ed. at 975 [61 S.Ct. at 645]. We, therefore, directed the District Court to retain the suit pending a determination by a state court of the underlying state law question.

*Id.*, 400 U.S. at 438, 91 S.Ct. at 510. *See also, Bellotti v. Baird,* 428 U.S. 132, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976).

As stated hereinabove, at the time *Upton v. Begley* was decided, this Court had already authoritatively construed Section 33 to eliminate any possibility of an equal protection violation. *See Ragland v. Anderson, supra,* and *Stiglitz v. Schardien, supra.* Simply stated, it failed to take account of controlling state authority which rendered the decision utterly unnecessary, and otherwise violated Supreme Court authority which directed abstention. For these reasons, *Upton v. Begley* is without authority of any kind.

We recognize that immediate effectiveness of this opinion would disrupt the orderly process of electing Representatives and Senators in 1994. We also recognize that by virtue of Section 31 of the Constitution of Kentucky, no member of the General Assembly may be deprived of his or her seat by virtue of reapportionment after the member is elected, and that regardless of changes in district composition which may occur subsequent to an election, a Senator or Representative is entitled to serve for and during the term for which he or she was elected and to represent the numerical district from which elected. *Anggelis v. Land,* Ky., 371 S.W.2d 857 (1963). With the foregoing in mind, we deem it appropriate to postpone the effective date of this decision, though not the finality of this opinion, until January 3, 1995, at which time the 1991 Reapportionment Act, KRS Chapter 5, shall be invalid.

As we said in *Ragland v. Anderson, supra:*

To hold it void would be to throw the government into chaos; and this no court is required to do. It is now too late to question its validity. The next Legislature must be elected under it, and then we have no doubt the members, impelled by their sense of duty, the obligations of their oath of office, together with that spirit of justice which is the heritage of the race, will redistrict the state as the Constitution requires. *Id.* at 870.

For the foregoing reasons, the judgment of the trial court is reversed. This cause is remanded to the trial court with directions to enter a declaratory judgment in conformity herewith and with directions to permanently enjoin the conduct of any election pursuant to the district boundaries set forth in KRS Chapter 5 after January 3, 1995.

STEPHENS, C.J., and LEIBSON, SPAIN and STUMBO, JJ., concur.

WINTERSHEIMER, J., dissents by separate opinion in which REYNOLDS, J., joins.

WINTERSHEIMER, Justice, dissenting.

I must respectfully dissent from the majority opinion because the reapportionment acts of 1991 and 1992 represent a legitimate exercise of legislative discretion in developing an apportionment plan based on the principle of equality of population as a primary factor. I agree with the holding of the circuit court that equality of population is the most important element in apportionment.

It is clear from any fair reading of Section 33 of the Kentucky Constitution that the integrity of the county unit when considered in an apportionment context is secondary to equality in population. It is regrettable that counties such as Boone, Campbell and Kenton, which are among the most populous counties in Kentucky, should be the subject of county splitting in any way. Certainly each of the county units could be considered as eligible to host the residence of a state senator as well as an appropriate number of representatives. However, the decision regarding such matters must be properly deferred to the judgment of the General Assembly in determining the importance of equality of population, integrity of counties and other valid factors which must be considered in the reapportionment process. It is undisputed that some Kentucky counties must be split when creating redistricting plans for the House and Senate. The Federal Constitution provides that the overriding consideration in any appointment plan is equality of population in state legislative districts. *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Population remains the controlling criterion. All parties to this litigation concede that the current redistricting plans would pass Federal constitutional muster.

Kentucky has adopted a similar approach in regard to the priority of population over all other considerations. *Ragland v. Anderson,* 125 Ky. 141, 100 S.W. 865 (1907), states in part that two counties may be joined to form one representative district, "provided it be necessary to effectuate that equality of representation which the spirit of the whole section so imperatively demands." *Combs v. Matthews,* Ky., 364 S.W.2d 647 (1963), found that equality of representation pervaded the entire Section 33 of the Kentucky Constitution. *Stiglitz v. Schardien,* 239 Ky. 799, 40 S.W.2d 315 (1931) asserts, "Equality of representation in the legislative bodies of the state is a right preservative of all other rights." The case does recognize that the failure to give a county or district equal representation is not merely a matter of partisan strategy. The decision as to which section of the constitutional provision is given priority must remain with the legislature when viewed in a state-wide context. Generally, the Federal courts have adopted a deferential policy toward apportionment when challenged in a state proceeding. Apportionment usually deals with a fundamental choice about the nature of representation which is primarily a political fairness question falling to the responsibility of the legislature. *Cf. Gaffney v. Cummings,* 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973). "It is much more plausible to assume that those who redistrict and reapportion work with both political and census data." *Gaffney, supra.* The fundamental presumption which must guide any judicial review of a

legislative reapportionment act · is that the apportionment's statutes are constitutional. *Stiglitz, supra.*

The evidence before the trial court indicated that the preservation of county boundaries was a factor considered by the General Assembly, but was not given as great importance as guaranteeing the one-person one-vote concept. Evidence was given about a competing plan, but it is not the role of a reviewing court to substitute one plan for another. That is the role of the General Assembly. Clearly there are two competing approaches to the same subject. The discretion to select one is plainly delegated to the legislature and not to the judiciary.

The most recent Federal case on the subject provides instruction on how to approach such a situation. *Hensley v. Wood,* 329 F.Supp. 787 (1971), held that regardless of the legitimate desire to preserve the integrity of political subdivision units, the primary concern of the legislature with respect to apportionment must be the equal weight of the vote of each citizen. Some divergence from the population equality standard is permissible if it is necessary based on a legitimate consideration incident to the effectuation of a rational state policy. A reapportionment statute that was based on political sentiments and traditional subdivisions, violated the one-person one-vote principle, and did not conform as nearly as practicable to the standard. *Hensley, supra.*

Any plan should not simply benefit a local or state government unit or further the career of any individual candidate. The purpose of reapportionment is to provide as nearly as possible equal electoral rights, that is—voting and representation to individual citizens. It is the people who must be given priority, not just where they live, but their common interests and unity of community concerns.

Certainly Fischer has presented a cogent position in a scholarly and well-written brief and articulated his views in an excellent oral argument. However, judicial review of reapportionment proceedings has generally expressed the priority of equality of representation over all other competing demands in legislative apportionment. The specific deci-

sion remains in the hands of the General Assembly, but population equality is the most important element.

REYNOLDS, J., joins in this dissent.