Thomas L. JENSEN, Appellant,

v.

KENTUCKY STATE BOARD OF ELECTIONS and Secretary of State of Kentucky, John Y. Brown, III and Attorney General of Kentucky, Albert B. Chandler, III and Jody Richards as a Member of Kentucky House of Representatives, as Speaker of Kentucky House of Representatives and on behalf of Legislative Research Commission, Legislative Research Commission, Jefferson County board of Elections, Rebecca Jackson, Jefferson County Clerk, James M. Vaughn, Jefferson County Sheriff, Warren County Board of Elections, Yvonne Guy, Warren County Clerk, and Jerry Gaines, Warren County Sheriff, Appellees.

No. 96–SC–000291–TG.

Supreme Court of Kentucky.

April 24, 1997.

As Amended May 29, 1997.

As Modified Sept. 4, 1997.

Dissenting Opinion of Justice Graves, Sept. 4, 1997.

Victor B. Maddox, John David Dyche, Tachau, Maddox & Hovious, Louisville, for Appellant Thomas L. Jensen.

A.B. Chandler, III, Atty. Gen., Scott White, Office of the Attorney General, Civil & Environmental Law Division, Frankfort, for Appellees Kentucky State Board of Elections; Secretary of State of Kentucky, John Y. Brown, III; and Attorney General of Kentucky, Albert B. Chandler, III.

David L. Yewell, David C. Condon, Rummage, Kamuf, Yewell, Pace & Condon, Owensboro, for Appellees Jody Richards as a Member of Kentucky House of Representatives; Jody Richards as Speaker of Kentucky House of Representatives; Jody Richards, on Behalf of Legislative Research Commission; and Legislative Research Commission.

Samuel D. Hinkle, IV, Stoll, Keenon & Park, Louisville, Robert W. Kellerman, Stoll, Keenon & Park, Frankfort, for Appellees Jefferson County Board of Elections; Rebecca Jackson, as Jefferson County Clerk; and James M. Vaughn as Jefferson County Sheriff.

Patrick C. Roemer, Asst. Warren County Atty., Bowling Green, for Appellees Warren County Board of Elections; Yvonne Guy as Warren County Clerk; and Jerry Gaines as Warren County Sheriff.

COOPER, Justice.

This appeal is the latest chapter in the Kentucky General Assembly's effort to redistrict itself in accordance with the 1990 census and Section 33 of the Constitution of Kentucky. *See, Fischer v. State Board of Elections*, Ky., 847 S.W.2d 718 (1993) (referred to in this litigation as *"Fischer I"*); *Fischer v. State Board of Elections*, Ky., 879 S.W.2d 475 (1994) (*"Fischer II"*); *State Board of Elections v. Fischer*, Ky., 910 S.W.2d 245 (1995) (*"Fischer III"*). The General Assembly's first effort to reapportion itself in accordance with the 1990 census was the 1991 Reapportionment Act. An action challenging the constitutionality of that Act was filed in the Campbell Circuit Court. In *Fischer I*, we held that the Campbell Circuit Court was a proper venue in which to bring the action. In *Fischer II*, we held that Section 33 mandates that reapportionment be accomplished by dividing the fewest number of counties possible while maintaining a maximum variation of plus-or-minus 5% from the ideal population of a legislative district. (Based on the 1990 census, the ideal population of a Senate district is 96,981 and the ideal population of a House district is 36,853.) Although all of the House and Senate districts created by the 1991 Reapportionment Act had populations within plus-or-minus 5% of the ideal district, the redistricting of the House of Representatives resulted in the division of forty-eight counties and the redistricting of the Senate resulted in the division of nineteen counties. Based upon proof that fewer counties could have been divided while maintaining the maximum population variation of plus-or-minus 5%, we found the 1991 Act to be an unconstitutional deviation from the requirements of Section 33. Pursuant to the mandate of *Fischer II*, the Campbell Circuit Court issued a permanent injunction enjoining elections under the 1991 Reapportionment Act.

In August 1995, the Governor of the Commonwealth called the General Assembly into special session for the purpose of considering *inter alia* the issue of reapportionment. The Senate and the House both passed redistricting plans; however, the House bill was vetoed by the Governor after the House had adjourned *sine die*. Meanwhile, on August 3, 1995, a member of the House of Representatives resigned and the Board of Elections petitioned the Campbell Circuit Court to amend the permanent injunction to permit a special election to fill the vacancy. That

petition was denied and we affirmed that denial in *Fischer III*.

When the General Assembly convened for its regular session on January 2, 1996, two redistricting bills were introduced, House Bill 1 and House Bill 164. House Bill 164 was defeated in committee. House Bill 1, as amended, was enacted as the 1996 Reapportionment Act and was signed into law by the Governor with an effective date of January 11, 1996. On that same date, two civil actions were filed in the Franklin Circuit Court. Appellant Jensen, a member of the House of Representatives from Laurel County, filed Civil Action No. 96–CI–00071 seeking to have the 1996 Reapportionment Act declared unconstitutional and to obtain a mandatory injunction requiring the General Assembly to adopt House Bill 164 for purposes of reapportionment. (This latter request has been properly ignored by all parties to this litigation; for the issuance of such an injunction would clearly violate the requirement of separation of powers. Ky. Const., Sections 27, 28, 29. Section 33 assigns to the legislature the duty to reapportion itself.) Appellees Richards, Speaker of the House of Representatives, and the Legislative Research Commission filed Civil Action No. 96–CI–00076 seeking a declaration that the 1996 Act is constitutional. On January 23, 1996, Appellant Jensen introduced House Bill 350, another redistricting plan for the House of Representatives. This bill was not passed out of committee. The two Franklin Circuit Court actions were consolidated and, on March 20, 1996, judgment was entered declaring the 1996 Act to be constitutional. Jensen appealed and we granted transfer. CR 74.02.

The 1996 Act divides the House of Representatives into one hundred districts, each containing a population within plus-or-minus 5% of the ideal House district population of 36,853. The Act further divides only twenty-two counties, the minimum number which can be divided in a redistricting plan based on the 1990 census. Twenty counties [1] have populations greater than 38,696, the 5% maximum deviation permitted by *Fischer II*, thus must be divided. In addition, the parties agree that because of the geographical location of the twenty largest counties, two additional counties must be divided because neither Bell County nor Calloway County can be joined with another whole county to form a district within the permissible population variation.[2] Thus, twenty-two is the minimum number of counties which can be divided and still comply with the maximum permissible population deviation.

Appellant premises his constitutional challenge on the fact that the 1996 Act does not create a whole House district within the boundaries of either Pulaski County or Laurel County, even though both counties have populations large enough to accommodate a whole district. (The Act also does not create a whole district within the boundaries of Christian County, which has a greater population than either Pulaski County or Laurel County.) Appellant asserts that if a county has a population sufficient to contain a whole district within its boundaries, Section 33 requires that a whole district be created within those boundaries. In other words, Appellant interprets Section 33 to guarantee that any county with a population within or greater than the maximum permissible deviation from the ideal House district will have at least one elected representative who is a resident of that county. He points to House Bill 164 as proof that this result can be achieved while still dividing only twenty-two counties and creating no district with a population variation greater than plus-or-minus 5%.

Appellant concedes that those counties [3] with sufficient populations to accommodate two or more whole districts within their respective boundaries cannot be guaranteed a corresponding number of districts without dividing more than twenty-two counties. Thus, House Bill 350, which was drafted and

---

1. Jefferson, Fayette, Kenton, Hardin, Daviess, Campbell, Warren, Pike, Christian, McCracken, Boone, Madison, Boyd, Pulaski, Bullitt, Hopkins, Franklin, Floyd, Laurel and Henderson.

2. However, the 1996 Act divides neither Bell County nor Calloway County, but instead divides Trigg County once and Leslie County twice.

3. Jefferson, Fayette, Kenton, Hardin, Daviess, Campbell, Warren and Pike.

introduced by Appellant after House Bill 1 was enacted and signed into law, would grant each county the maximum number of whole districts which its population would permit. However, House Bill 350 divides thirty counties to accomplish this result. Appellant requests that we reconsider *Fischer II* and interpret Section 33 to require the division of a minimum number of counties only after each county large enough to contain a whole district is awarded the maximum number of whole districts which can be accommodated by its population. He also notes that we could place an even greater emphasis on the preservation of county integrity by permitting slightly greater population variations than plus-or-minus 5%; and, indeed, other state plans with greater deviations have been held not to violate federal constitutional requirements where the deviations were shown to be "based on legitimate considerations incident to the effectuation of a rational state policy." *Reynolds v. Sims,* 377 U.S. 533, 579, 84 S.Ct. 1362, 1391, 12 L.Ed.2d 506 (1964). *See also Brown v. Thomson,* 462 U.S. 835, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983); *Mahan v. Howell,* 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973).

The full text of Section 33 is as follows:

The first General Assembly after the adoption of this Constitution shall divide the State into thirty-eight Senatorial Districts, and one hundred Representative Districts, as nearly equal in population as may be *without dividing any county, except where a county may include more than one district,* which districts shall constitute the Senatorial and Representative Districts for ten years. Not more than two counties shall be joined together to form a Representative District: Provided, In doing so the principle requiring every district to be as nearly equal in population as may be shall not be violated. At the expiration of that time, the General Assembly shall then, and every ten years thereafter, redistrict the State according to this rule, and for the purposes expressed

in this section. If, in making said districts, inequality of populations should be unavoidable, any advantage resulting therefrom shall be given to districts having the largest territory. No part of a county shall be added to another county to make a district, and the counties forming a district shall be contiguous. (Emphasis added.)

In *Fischer II,* we held that "[t]he mandate of Section 33 is to make full use of the maximum constitutional population variation as set forth herein [plus-or-minus 5%] and divide the fewest possible number of counties." *Id.* at 479. In *Fischer III, supra,* at 246, fn. 1, we reiterated that this was the central holding of *Fischer II.* We have long held that when the goals of population equality and county integrity inevitably collide, the requirement of approximate equality of population must control. *Combs v. Matthews,* Ky., 364 S.W.2d 647 (1963); *Stiglitz v. Schardien,* 239 Ky. 799, 40 S.W.2d 315 (1931); *Ragland v. Anderson,* 125 Ky. 141, 100 S.W. 865 (1907). In fact, Kentucky was recognized as one of the few states which held prior to *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) that in apportioning legislative bodies, equality of population has priority over political subdivision boundaries. Robert G. Dixon, Jr., *Democratic Representation: Reapportionment in Law and Politics* (Oxford University Press, 1968).[4] We reiterated this priority in *Fischer II* when we adopted plus-or-minus 5% as the maximum population variation allowable in creating House and Senate districts. This variation has been recognized by the United States Supreme Court as a "minor deviation" insufficient to make out a prima facie case of invidious discrimination. *Brown v. Thomson, supra,* 462 U.S. at 842, 103 S.Ct. at 2696; *Connor v. Finch,* 431 U.S. 407, 418, 97 S.Ct. 1828, 1835, 52 L.Ed.2d 465 (1977). *Fischer II* then held that after satisfying the requirement of approximate equality of population, the next priority of a reapportionment plan is the preservation of county integrity, which is

---

**4.** Despite this reputation premised upon our decisions in *Ragland v. Anderson* and *Stiglitz v. Schardien, supra,* the reapportionment acts of 1918 and 1942 strictly followed the "no division" requirement of Section 33 by not dividing any

counties except those large enough to contain two or more districts and not adding the excess population of one county to another county to make a district. Acts 1918, ch. 139, p. 472; Acts 1942, Ex.Sess., ch. 2, § 1.

accomplished by dividing the fewest possible number of counties.

Appellant interprets the mandate of Section 33 that the state be redistricted "without dividing any county, except where a county may include more than one district ..." to mean that if a county has sufficient population to accommodate a whole district, it cannot be divided until after such a district is created. However, a reading of the constitutional debates concerning Section 33 reveals that the intent of the quoted phrase was to preclude any division of a county unless that county had sufficient population to accommodate *two* whole districts, not merely population in excess of that required to form *one* whole district.

> It was the meaning of the section adopted by the Convention, that whatever ambiguity might cling, no county should be divided. I think that this convention is unanimous in that regard, that they do not want any county divided unless it is entitled to two representatives. In other words, we do not want one part of a county added to another for the purpose of securing representation.

3 *Proceedings and Debates Constitutional Convention 1890*, at 4423. What is clear from the debates and from the language of Section 33 is that the delegates did not intend that any territory of one county be added to another county to make a district. If a county had population in excess of that required to form a district, the excess population remained with that district unless the county had sufficient population to contain two whole districts. As so interpreted, Section 33 would preclude *any* division of Laurel, Pulaski and Christian counties. Yet, because of the overriding principle of equality of population, we recognized in *Fischer II* that this mandate cannot be achieved. Twenty-one counties are now divided in a way that remnants of their populations are joined with other counties to form separate districts.[5] The delegates probably did not

foresee that a county with sufficient population to contain a whole district within its borders might not be given such a district. However, regardless of what the delegates may or may not have foreseen, that requirement was not included in the language of Section 33. The language relied upon by Appellant simply limits those counties which can be divided to those with populations sufficient to support at least two districts, a goal which is unachievable if the fewest possible number of counties are to be divided as required by *Fischer II*. Note that House Bill 350, which would create at least one whole district within each county with sufficient population to contain a whole district, a requirement not specified in Section 33, would require the division of thirty counties.

An examination of the proceedings and debates of the 1890 convention clearly shows that the delegates did not intend to guarantee that a county must be represented by a resident of that county. The following amendments were proposed and rejected:

> 1. A Representative in the most popular branch of the General Assembly shall be chosen from each county in the State.

> 2. In order to apportion the representation in the House of Representatives in this State, the ratio to be ascertained by dividing the entire population of the State by one hundred, and each county shall have at least one Representative; but each county having two ratios shall have two members, one District Representative for each additional ratio in said county.

> 3. Any county having a population of ten thousand, or a voting population of two thousand, shall be entitled to one member in the most popular branch of the General Assembly.

> 4. Each county shall have one Representative.

4 *Proceedings and Debates, supra,* at 4609. In fact, fifty-two counties,[6] including Laurel,

---

5. Jefferson County is divided eighteen times, but all eighteen districts are encompassed within the borders of that county.

6. Adair, Allen, Anderson, Bath, Bracken, Breathitt, Caldwell, Carlisle, Carroll, Casey, Clinton, Crittenden, Cumberland, Edmonson, Estill,

Fleming, Fulton, Gallatin, Grayson, Green, Hancock, Henry, Hickman, Larue, Laurel, Lawrence, Lee, Leslie, Lewis, Lincoln, Livingston, Lyon, Magoffin, Martin, McCreary, McLean, Menifee, Metcalfe, Nicholas, Ohio, Owen, Owsley, Pendle-

but not including Pulaski or Christian, are presently represented by elected state representatives who do not reside within their borders. Of course, the mere fact that there are 120 counties and only one hundred House members guarantees that many counties will be represented by legislators who do not reside within their borders.

Unable to find support for his proposition in the language of Section 33, itself, Appellant attributes constitutional significance to an observation contained in footnote 5 in *Fischer II*, to wit:

> We recognize that the division of some counties is probable and have interpreted Section 33 to permit such division to achieve population requirements. However, we can scarcely conceive of a circumstance in which a county or part thereof which lacks sufficient population to constitute a district would be subjected to multiple divisions.

Like the delegates to the 1890 convention, we could not envision that a county with sufficient population to support a whole district within its borders might not be awarded such a district, or that a county or remnant thereof might be subjected to multiple divisions. However, we did not hold in footnote 5 that such is constitutionally prohibited. In fact, what we thought was scarcely conceivable has been proven to be unavoidable. All three redistricting plans, including Appellant's own House Bill 350, contain numerous so-called "footnote 5 violations." No one now suggests that any redistricting plan could be drafted without some such multiple divisions.

■ Appellant suggests in his brief that the multiple divisions of Pulaski County and Laurel County are the result of partisan gerrymandering, since both counties consist primarily of registered Republicans and the 1996 House of Representatives was controlled by a Democratic majority. Of course, this assertion ignores the fact that Christian County, hardly a bastian of Republicanism, also was subjected to multiple divisions with-

out being awarded a whole district within its boundaries. Nevertheless, the mere fact that a particular apportionment scheme makes it more difficult for a particular group in a particular district to elect the representatives of its choice does not render that scheme constitutionally infirm. Unconstitutional discrimination in reapportionment occurs only when the electoral system is arranged in a manner that will consistently degrade a voter's or group of voters' influence on the political process as a whole. *Davis v. Bandemer*, 478 U.S. 109, 131–133, 106 S.Ct. 2797, 2810, 92 L.Ed.2d 85 (1986) (plurality opinion). Since the 1996 Act guarantees only nineteen [7] of 120 counties representation by a county resident in the House of Representatives, the mere fact that the Act does not guarantee such representation to the citizens of Pulaski and Laurel counties does not constitute impermissible discrimination.

There is a difference between what is perceived to be unfair and what is unconstitutional. Apportionment is primarily a political and legislative process. *Gaffney v. Cummings*, 412 U.S. 735, 749, 93 S.Ct. 2321, 2329, 37 L.Ed.2d 298, 310 (1973). Our only role in this process is to ascertain whether a particular redistricting plan passes constitutional muster, not whether a better plan could be crafted. This plan satisfies the constitutional requirements of Section 33 and the mandate of *Fischer II* "to make full use of the maximum constitutional population variation as set forth herein [plus-or-minus 5%] and divide the fewest possible number of counties." *Fischer II, supra*, at 479; *Fischer III, supra*, at 246, fn. 1. The judgment of the Franklin Circuit Court is affirmed.

STEPHENS, C.J., and JOHNSTONE, STUMBO and WINTERSHEIMER, JJ., concur.

LAMBERT, J., dissents by separate opinion with GRAVES, J., joining that dissent.

---

ton, Powell, Robertson, Rowan, Spencer, Todd, Trigg, Trimble, Washington and Wolfe.

**7.** The remaining seventeen of the twenty largest counties, plus Harlan and Greenup, each of

which has a population within the maximum plus-or-minus 5% variation and thus constitutes a district within itself.

LAMBERT, Justice, dissenting.

For its decision in this case the majority has ignored our *central holding* in *Fischer v. State Board of Elections*, Ky., 879 S.W.2d 475 (1994) (*"Fischer II"*), and seized upon *obiter dictum* as its decisional basis, thereby placing its imprimatur upon the political dismemberment of two of Kentucky's largest counties. There should be no misunderstanding about what transpired and what the majority has approved. Pulaski County, a county of 49,489 population, has been divided among five representative districts, and Laurel County, a county of 43,438 population, has been divided among five representative districts. In neither county is there a district contained wholly within its borders notwithstanding that both Pulaski County and Laurel County have population well in excess of the 36,853 which is required for a district. At oral argument a map was displayed before the Court showing the House districts at issue here. Except for House District 85 which contains a substantial portion of both Pulaski and Laurel counties, these counties are otherwise carved apart and added to other counties in utter contempt for the principle of preservation of county political integrity, the heart and soul of *Fischer II*.

Section 33 of the Constitution provides that the House of Representatives shall be divided into one hundred districts "as nearly equal in population as may be without dividing any county." It also provides that "[n]o part of a county shall be added to another county to make a district...." From the Debates of the Constitutional Convention, there is no doubt that the Delegates meant what they said. Counties were not to be divided. However, with the decision of the Supreme Court of the United States in *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the Constitution of Kentucky was forced to yield to the extent of allowing some division of counties to achieve population requirements. While the division of some

counties was required, the principle of county integrity did not cease to exist. That principle, as modified to meet federal constitutional requirements, is that there be the least possible division of counties. Thus, a county or counties may not be divided at all or any more than is necessary to achieve population requirements. Where division is necessary, the principle of county integrity should be maintained so that the division will be the least disruptive. This is the holding in *Fischer II*.

As justification for upholding the re-apportionment plan here under review, the majority has relied upon dictum in the *Fischer II* opinion as follows: "The mandate of Section 33 is to make full use of the maximum constitutional variance as set forth herein and divide the fewest possible number of counties." As with any case, however, *Fischer II* must be read in light of the issues before the Court. There was no issue as to whether there could be multiple division of counties.[1] The only issue concerned the number of split counties. Simply stated, there was no reason in *Fischer II* to anticipate multiple splits of larger counties. This issue is brand new to this case. It has not been previously before the Court. It is a serious misreading of *Fischer II* to say that it authorizes what was done here. Our mandate to divide the fewest number of counties must be read in the context of the case we were deciding. We had no duty to anticipate a wholly non-existent issue. Here the issue *is* whether multiple divisions are permissible. Our duty is to apply the last sentence of Section 33 where it says, "[n]o part of a county shall be added to another county to make a district."

In light of the majority opinion validating what took place here, there will be nothing to prevent the multiple division of other counties and it is entirely foreseeable that such could be used as a partisan weapon, perhaps in ways wholly beyond our present contem-

---

1. Contrary to what some would consider sound judicial practice, the Court did anticipate the possibility that some small, politically defenseless county which lacked sufficient population for a House district might be subjected to multiple divisions so as to satisfy population guidelines while being counted as but a single divided coun-

ty. In n. 5, the Court sought to prevent "balancing the budget" on the backs of a few small counties. However, what was wholly unanticipated was that the budget would be balanced on the backs of two large counties. Any reasonable application of the reasoning of n. 5 would forbid what happened here.

plation.[2] *Fischer II* sought to reinvigorate the concept of county integrity as manifest in Section 33. We should not allow it to be distorted to achieve any other result. Section 33 of the Constitution of Kentucky is our responsibility and we should defend it.

For these reasons, I dissent.

GRAVES, J., joins this dissenting opinion.

GRAVES, Justice, dissenting.

The majority opinions in, *"Fischer I," "Fischer II,"* and *"Fischer III,"* as well as the respective dissents to those opinions, represent good faith efforts by the Kentucky General Assembly and the courts of this Commonwealth to satisfy the increasingly difficult mandates of the United States Supreme Court generated by *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) and its progeny. It is my opinion that *Baker v. Carr* takes federalism too far in imposing the theory of "one man-one vote" as a constitutional requirement in legislative apportionment. Compliance with *Baker v. Carr* challenges the sovereignty of states and disrupts the integrity of many long established and well-functioning legislative districts. Compliance with the federal mandates has demonstrated that achieving the federally-mandated "one man-one vote" redistricting disrupts and impairs the identity, continuity, and sense of community of units of government established to represent a constituency having common interests. As demographics become more fluid, complying with *Baker v. Carr* will become progressively more difficult, if not impossible. In a mobile society where less than 50 percent of the people bother to vote, the egalitarianism desired in *Baker* is irrelevant.

Some political scientists have proposed that the United States Constitution should be amended to remove the jurisdiction of the United States Supreme Court to dictate po-

litical matters to the states. A solution worthy of exploration to the federal mandate is for the Commonwealth of Kentucky to amend its Constitution to allow each county, and perhaps each political unit in the larger counties, to be proportionately represented in the General Assembly. Another possible approach would be to borrow from the federal model whereby one house is apportioned to population and the other on political subdivision.

By placing isolated precincts from a county within a district containing a much larger county effectively precludes well-qualified citizens in the isolated precincts from ever being elected to the General Assembly due to demographic disadvantages.

2. The majority has made reference to the three-way division of Christian County as indicating a lack of partisanship in the multiple division of Pulaski and Laurel counties. What it failed to say is that while Christian County lacks sufficient population to have two representative districts, it is apportioned so as to virtually guarantee two representatives from Christian County. The 8th

House District consists of 45 precincts, 38 of which are in Christian County (KRS 5.208), and the 9th House District consists of 275 precincts, 274 of which are in Christian County (KRS 5.209). Any suggestion that the Christian County division is comparable to the division of Laurel and Pulaski counties is misguided.