**LEGISLATIVE RESEARCH COMMISSION,**
Appellant,

v.

**Joseph M. FISCHER; Jeff Hoover; Kim King; Frey Todd; Anthony Gaydos; Alison Lundergan Grimes, in her Official Capacity as Kentucky Secretary of State; Kentucky State Board of Elections; Maryellen Allen, in her Of-**

---

ficial Capacity as Interim Acting Executive Director of the Kentucky State Board of Elections; David B. Stevens, M.D.; David O'Neill; Jack Stephenson; Marcus McGraw; and Kathy Stein, Appellees.

Nos. 2012–SC–000091–TG,
2012–SC–000092–TG.

Supreme Court of Kentucky.

April 26, 2012.

Laura Hromyak Hendrix, General Counsel, Legislative Research Commission, Frankfort, KY, Sheryl G. Snyder, Frost Brown Todd LLC, Louisville, KY, Counsel for Appellant.

Jack Conway, Attorney General of Kentucky, David B. Tachau, Dustin Elizabeth Meek, Jonathan Todd Salomon, Katherine Ellen McKune, Tachau Meek PLC, Louisville, KY, Anita Mae Britton, Britton, Osborne & Johnson, PLLC, Lexington, KY, Counsel for Appellees Alison Lundergan Grimes, in her Official Capacity as Kentucky Secretary of State, Kentucky State Board of Elections, and Maryellen Allen, in her Official Capacity as Interim Acting Executive Director of the Kentucky State Board of Elections.

Victor Bruce Maddox, Jennifer Metzger Stinnett, John David Dyche, Jason Michael Nemes, Fultz, Maddox, Hovious & Dickens, PLC, Louisville, KY, Counsel for Appellees Joseph M. Fischer, Jeff Hoover, Kim King, Frey Todd, and Anthony Gaydos.

Scott White, Morgan & Pottinger, P.S.C., Lexington, KY, Counsel for Appellees David B. Stevens, M.D., David O'Neill, Jack Stephenson, Marcus McGraw, and Kathy Stein.

Opinion of the Court by Chief Justice MINTON.

Applying legal precedent established nearly twenty years ago in *Fischer v. State*

*Bd. of Elections*[1] (*Fischer II*), the trial court found the legislative redistricting plans of House Bill 1[2] facially unconstitutional and issued a temporary injunction preventing the Kentucky Secretary of State and the Kentucky State Board of Elections from implementing the legislative districts created by the Bill. The Legislative Research Commission (LRC) appealed the trial court's decision, and we granted immediate transfer of the appeal to this Court.

The LRC asks us to overrule the constitutional standards for redistricting legislative districts delineated in *Fischer II* by (1) allowing the General Assembly to divide more than the mathematically minimum number of counties necessary to achieve the population deviation goal and (2) establishing that an overall population deviation among legislative districts of less than 10 percent satisfies the requirement for population equality. The LRC also asks us to overturn the trial court's temporary injunction because it is predicated upon an erroneous conclusion of law.

After carefully considering the important constitutional issues, we affirm the trial court's decision. House Bill 1 violates Section 33 of the Kentucky Constitution in two ways: (1) it fails to achieve sufficient population equality and (2) it fails to preserve county integrity.

The Kentucky House of Representatives and Kentucky Senate redistricting plans of House Bill 1 both contain at least one district with a population deviation greater than 5 percent from the ideal district. And the LRC has not carried its burden of proving this excessive population variation is a result of a consistently applied rational state policy. Both plans also divide more than the mathematically minimum number of counties necessary to achieve approximate population equality.

Because House Bill 1 is unconstitutional and to ensure the orderly administration of the approaching 2012 elections, we remand the case to the trial court to enjoin permanently the conduct of any election under the district boundaries established by the Bill. Because the propriety of the trial court's injunction is not at issue in this appeal, we do not reach the questions of county contiguity and voter disenfranchisement.

## I. THE CONTROVERSY OVER HOUSE BILL 1 IS BROUGHT TO THE COURTS.

Joseph Fischer, Jeff Hoover, Kim King, Frey Todd, and Anthony Gaydos filed suit in Franklin Circuit Court asserting various state and federal constitutional challenges to the Kentucky House of Representatives' reapportionment plan adopted by the Kentucky General Assembly in House Bill 1. The trial court granted the motion of David B. Stevens; David O'Neill; Jack Stephenson; Marcus McGraw; and Kathy Stein to intervene as plaintiffs under Kentucky Rules of Civil Procedure (CR) 24.01. As Intervening Plaintiffs, they raised similar constitutional challenges to the Kentucky Senate's redistricting plan contained in House Bill 1. Both Plaintiffs and Intervening Plaintiffs sought to enjoin the Kentucky Secretary of State and Kentucky State Board of Elections from proceeding with the 2012 elections under the redistricting plans of House Bill 1.

Pending its decision on the motion for temporary injunction, the trial court issued

---

1.  879 S.W.2d 475 (Ky.1994).

2.  An Act Relating to Redistricting and Declaring an Emergency, 2012 Kentucky General Assembly, House Bill 1 (to be enacted in 2012 Ky. Acts, Chapter 1), *invalidated by* Court Order, *Legislative Research Comm'n v. Fischer*, 366 S.W.3d 905 (Ky.2012).

a restraining order, under CR 65.03, prohibiting the Secretary of State from implementing the filing deadline for legislative offices. Meanwhile, the trial court granted the LRC's motion under Kentucky Revised Statutes (KRS) 5.005[3] to intervene as defendants in the suit.

Following an evidentiary hearing, the trial court issued a temporary injunction based on its findings that House Bill 1 violated Section 33 of the Kentucky Constitution as construed by *Fischer II* and that substantial issues of law existed concerning the contiguity of counties and disenfranchisement of voters. The trial court designated its finding of unconstitutionality final and appealable and reserved ruling on all other claims and defenses.

The trial court's findings of fact are largely uncontested on appeal. Using the population data from the 2010 census introduced into evidence, the trial court found that the ideal district for the House of Representatives would contain a population of 43,394; and the ideal district for the Senate would contain 114,194 people. Under the reapportionment plans created by House Bill 1, House District 24 contains a population of 45,730, which deviates from the ideal House district by 5.38 percent; and Senate District 8 contains a population of 120,498, which deviates from the ideal Senate district by 5.52 percent.

House Bill 1 also divides 28 counties in the House plan and 5 counties in the Senate plan. The record demonstrates that it is possible to divide as few as 24 counties in the House districts and 4 counties in the Senate districts. The House redistricting plan of House Floor Amendment 1 to House Bill 1 divides only 24 counties, and the Senate redistricting plan contained in Senate Floor Amendment 1 to House Bill 1 divides only 4 counties.[4]

Under House Bill 1, the overall deviation among the House districts is 10 percent[5] and 9.84 percent among the Senate districts. The overall deviation represents the variance between the least populous and most populous districts in the plan.

The trial court also made findings of fact pertinent to the issues of county contiguity and disenfranchisement of voters under House Bill 1.[6]

Based on these factual findings, the trial court concluded the following: House Bill 1 violates Section 33 of the Kentucky Constitution because at least one House district and one Senate district have a population variance greater than 5 percent of the ideal districts and because it fails to divide the fewest number of counties in the House and the Senate. The plaintiffs below raised a substantial issue of law re-

**3.** KRS 5.005(3) provides, "The Legislative Research Commission may intervene as a matter of right in any action challenging the constitutionality of any legislative district created by this chapter."

**4.** The record reflects that both alternative plans also have a population variance within plus-or-minus 5 percent of the ideal districts.

**5.** The trial court rounded the overall deviation down from 10.00132873 percent.

**6.** The trial court found that the vast majority of the geographic territory that constituted the former Senate District 13 and almost all

the voters who resided there are reassigned by House Bill 1 to Senate District 4. By virtue of this reassignment, the voters who reside in that territory cannot vote for and elect a Senator for two additional years. House Bill 1 also reassigns the voters of 9 other counties in their entirety from odd-numbered Senate districts to even-numbered Senate districts, thereby delaying those residents opportunity to elect a senator for two additional years. And "House District 80 contains a one[-]mile wide strip that runs from the Casey County border, through the northwestern corner of Pulaski County, to the Rockcastle County border. This strip of Pulaski County contains only [1,882] residents."

garding whether one or more House districts contain contiguous counties. And the intervening plaintiffs below raised a substantial issue of law concerning whether House Bill 1 unconstitutionally impairs their right to vote for and elect a senator.

The trial court enjoined the Secretary of State and the Board of Elections from implementing the House and Senate Districts set forth in House Bill 1. Accordingly, the districts as enacted in the 2002 redistricting plan, codified in KRS 5.200, et seq., would remain in place until the General Assembly passes constitutional redistricting legislation. The trial court also extended the filing deadline set forth in KRS 118.165 to allow all candidates and potential candidates the opportunity to make the required candidacy filings under the temporary injunction.

The LRC appealed the trial court's final judgment to the Court of Appeals and filed a CR 65.07 motion for emergency and interlocutory relief from the temporary injunction entered by the trial court. The LRC then moved this Court to transfer its appeal of the trial court's final judgment from the Court of Appeals to the Supreme Court. It also filed with this Court (1) a motion for emergency relief, under CR 65.07(6), to dissolve the temporary injunction entered by the trial court and (2) a CR 76.33 motion to stay enforcement of the trial court's partial judgment declaring House Bill 1 unconstitutional.

On recommendation of the Court of Appeals, under CR 74.02(5), we granted transfer to this Court from the Court of Appeals the LRC's motions to obtain interlocutory and emergency relief. And we entered an order denying the motions for emergency relief and to stay enforcement, leaving the temporary injunction intact. Under CR 74.02(1), we accepted transfer of the LRC's appeal of the final judgment. We expedited briefing and heard oral arguments. Because time was of the essence, following oral arguments, we issued an order affirming the lower court's decision and reiterating that the terms of the injunction entered by the trial court remained in place. This opinion elucidates our order to give the General Assembly guidance in its efforts to timely enact redistricting legislation.

## II. THE COURTS HAVE A DUTY TO DETERMINE THE CONSTITUTIONALITY OF HOUSE BILL 1'S REDISTRICTING PLAN.

■ Kentucky legislative reapportionment plans are governed by both the federal and state constitutions. Section 33 of the Kentucky Constitution and equal protection principles under the Fourteenth Amendment of the United States Constitution require that every citizen's vote carries the same voting power.[7] This is referred to in federal law as the "one person, one vote" principle. Constituencies must include approximately equal numbers of voters to avoid diluting the weight of individual votes in larger districts, which would infringe upon that citizen's right to fair and effective representation.[8]

■ "[A] claim asserted under the Equal Protection Clause challenging the constitutionality of a [s]tate's apportionment of seats in its legislature … [is] a justiciable controversy subject to adjudication by federal courts."[9] But while "federal decisions require virtual perfection in

7. *Hadley v. Junior Coll. Dist. of Metro. Kansas City, Mo.,* 397 U.S. 50, 54, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970) (citations omitted).

8. *Reynolds v. Sims,* 377 U.S. 533, 555–56, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

9. *Id.* at 556, 84 S.Ct. 1362 (*citing Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)).

the apportionment of [c]ongressional districts,"[10] state legislative reapportionment plans need only achieve substantial population equality.[11] State law is preempted to the extent it conflicts with this federal requirement.

Section 33 of the Kentucky Constitution, in relevant part, requires that every 10 years "[t]he ... General Assembly ... shall divide the [s]tate into thirty-eight [s]enatorial [d]istricts[ ] and one hundred [r]epresentative [d]istricts, as nearly equal in population as may be without dividing any county[;] ... and the counties forming a district shall be contiguous." Well before federal "one person, one vote" principles were applied to the states, Kentucky's highest court interpreted Section 33 of the Kentucky Constitution to prioritize "substantial equality of representation" over county integrity.[12] This avoided eventual conflict with, and preemption by, the federal Equal Protection Clause.

■ Independent of the federal standard under the Fourteenth Amendment, Section 33 imposes a dual mandate that Kentucky's state legislative districts be substantially equal in population and preserve county integrity. A reapportionment plan satisfies these two requirements by (1) maintaining a population variation that does not exceed the ideal legislative district by −5 percent to +5 percent and (2) dividing the fewest number of counties possible.[13] Our holding that House Bill 1

is unconstitutional is based not upon federal law, but upon Section 33 of the Kentucky Constitution.

■ We do not violate the separation of powers doctrine by finding House Bill 1 unconstitutional. "Our only role in this process is to ascertain whether a particular redistricting plan passes constitutional muster[.]"[14] And "no matter how distasteful it may be for the judiciary to review the acts of a [coordinate] branch of the government[,] their duty under their oath of office is imperative."[15] By finding House Bill 1 unconstitutional, we are not selecting a better legislative redistricting plan but simply upholding our duty faithfully to interpret the Kentucky Constitution. If the legislature is displeased with our interpretation, it is, of course, free to pursue a constitutional amendment to Section 33 with the people of the Commonwealth.

**A. House Bill 1 Violates Section 33 of the Kentucky Constitution by Failing to Divide the Fewest Number of Counties Possible.**

*Fischer II* requires division of the fewest number of counties mathematically possible in reapportionment plans.[16] The LRC contends this is a judge-made standard not mandated by the Kentucky Constitution and that this standard should be replaced with a good faith requirement to divide only the fewest number of counties as is politically possible.[17] We disagree.

10. *Fischer*, 879 S.W.2d at 478.

11. *Reynolds*, 377 U.S. at 579, 84 S.Ct. 1362 ("[T]he overriding objective must be substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the [s]tate.").

12. *Fischer*, 879 S.W.2d at 477 ("Since its rendition, *Ragland* [v. *Anderson*, 125 Ky. 141, 100 S.W. 865 (Ky.1907),] has been understood to require substantial equality of representation for all citizens of Kentucky....").

13. *Id.* at 479.

14. *Jensen v. Kentucky State Bd. of Elections*, 959 S.W.2d 771, 776 (Ky.1997).

15. *Ragland*, 100 S.W. at 867.

16. *Fischer*, 879 S.W.2d at 479.

17. In support of this argument, the LRC notes that by dividing more counties than the mathematical minimum, larger portions of more populous counties would remain intact. We

The text of Section 33 is clear that "as between the competing concepts of population equality and county integrity, the latter is of at least equal importance. The probability of population inequality is acknowledged, but the command with respect to the division of any county is absolute."[18] And complying with Section 33's prohibition against split counties would violate equal protection principles.[19] So we recognized in *Fischer II* that Kentucky avoided federal preemption because our earlier decisions[20] construed Section 33 to give primacy to population equality.[21] But we firmly stated that "total destruction of county integrity is not required and should be balanced with population equality to accommodate both."[22] We reaffirm this assertion today.

Contrary to the LRC's argument, this Court did not retreat from the importance of county integrity in *Jensen*.[23] The appellant in that case asked the Court to "place an even greater emphasis on the preservation of county integrity by permitting slightly greater population variations than plus-or-minus 5 [percent.]"[24] In rejecting the appellant's contention, we recognized that "the requirement of approximate equality of population must control" when it is incompatible with the goals of maintaining county integrity.[25] But this does not represent a relaxation of the county integrity principle. The *Jensen* Court explained that population equality cannot be disregarded in order to maintain county integrity. Rather, "after satisfying the requirement of approximate equality of population, the next priority of a reapportionment plan is the preservation of county integrity, which is accomplished by dividing the fewest possible number of counties."[26]

Although the concern for population equality overrides the maintenance of county integrity, Section 33 of the Constitution mandates county integrity. The LRC is correct that Section 33 does not require division of the fewest number of counties possible; it actually prohibits the division of any county. Although we cannot uphold the mandate of Section 33 without violating equal protection, we also cannot ignore the drafters' goal of preserving county integrity.[27]

decline to address the LRC's assertion because this is essentially the same argument made and rejected in *Jensen*. The appellant there asked the Court to require division of the minimum number of counties only after each county large enough to contain a whole district is awarded the maximum number of whole districts that could be accommodated by its population. 959 S.W.2d at 774. The Court rejected this argument, upholding the requirement articulated in *Fischer II* to divide the fewest counties mathematically possible.

18. *Fischer*, 879 S.W.2d at 477.

19. *Id.* at 479–80.

20. *Ragland*, 125 Ky. 141, 100 S.W. 865; *Stiglitz v. Schardien*, 239 Ky. 799, 40 S.W.2d 315 (1931).

21. *Fischer*, 879 S.W.2d at 479–80.

22. *Id.* at 479.

23. 959 S.W.2d 771.

24. *Id.* at 774.

25. *Id.* (citations omitted).

26. *Id.* at 774–75.

27. Other states have also balanced dual goals of preserving political subdivisions and population equality. *E.g., In re Colorado Gen. Assembly,* —— P.3d ——, ——, 2011 WL 5830123 (Colo.2011) ("We hold that the Adopted Plan is not sufficiently attentive to county boundaries to meet the requirements of" the Colorado Constitution.); *Holt v. 2011 Legislative Reapportionment Comm'n,* —— Pa. ——, 38 A.3d 711, 760 (2012) ("[W]e ... reaffirm the importance of the multiple commands in [the Pennsylvania Constitution], which embrace contiguity, compactness, and the integrity of political subdivisions, no less than the command to create legislative districts as nearly equal in population as 'practicable.' ").

■■ "It is a cardinal rule of construction that the different sections of the Constitution shall be construed as a whole so as to harmonize the various provisions and not to produce a conflict between them." [28]

Another rule of constitutional construction is to give effect to the intent of the framers of the instrument and of the people adopting it. The Constitution should not be construed so as to defeat the obvious intent of its framers if another interpretation may be adopted equally in accordance with the words and sense which will carry out the intent. The intent must be gathered both from the letter and the spirit of the document." [29]

Applying these principles, we are not free to disregard the drafters' intent to preserve county integrity by striking the provision from Section 33.[30] We must harmonize the dual mandates to the greatest extent possible while achieving the overarching goal of population equality. The *Fischer II* Court appropriately balanced these goals by requiring reapportionment plans divide the mathematically fewest number of counties possible.

■ House Bill 1 violates Section 33 of the Constitution because it fails to divide the fewest number of counties possible.

The record demonstrates that alternative plans were proposed in both chambers to divide as few as 24 counties in the House districts and 4 counties in the Senate districts.[31] But House Bill 1 divides 28 counties in the House districts and 5 counties in the Senate districts. The trial court correctly found that these reapportionment plans violate Section 33.

**B. House Bill 1 Violates Section 33 of the Kentucky Constitution by Failing to Achieve Sufficient Population Equality.**

The LRC asks us to relax the plus-or-minus 5 percent rule and adopt a federal standard, which generally finds an overall population deviation of less than 10 percent so insignificant that a court may overlook it when assaying redistricting issues.[32] And it argues House Bill 1 is constitutional as measured by the federal standard because the overall population deviation of the House districts is 10.0013287 percent and of the Senate districts is 9.84 percent.

In support of this argument, the LRC suggests the *Fischer II* Court meant to adopt this federal standard but erroneously articulated it as plus-or-minus 5 percent deviation from the ideal district. The

---

28. *Wood v. Bd. of Educ. of Danville,* 412 S.W.2d 877, 879 (Ky.1967) (citations omitted).

29. *Grantz v. Grauman,* 302 S.W.2d 364, 367 (Ky.1957) (citation omitted).

30. There is also a rule "that where the language of the Constitution leaves no doubt of the intended meaning of the section under consideration, courts may not employ rules of construction." *Id.* at 366 (citations omitted). But, here, we are constrained by federal law from interpreting Section 33 in accordance with its plain language. So it is appropriate to turn to the rules of construction.

31. To determine the fewest possible number of counties to split, one first divides each county with a population greater than 1.05

percent of an ideal district. Then one determines the number of counties that must be divided because their populations and the populations of their contiguous counties do not allow them to be joined whole to another county to form a district. *See Jensen,* 959 S.W.2d at 773; Office of Attorney General 1996 opinion, OAG 96–1, http://ag.ky.gov/NR/rdonlyres/7C086E68–3B78–458D–9A0B–453E9859F9EA/0/OAG9601.htm.

32. In its brief, the LRC repeatedly states the federal standard finds *de minimis* an overall population deviation of 10 percent. But, as it admits in a footnote, the standard is more accurately stated as *less than 10 percent.*

LRC also argues that the 5 percent deviation rule is flawed because it requires reapportionment plans to make full use of the maximum population deviation to calculate the fewest number of counties possible. We disagree.

This Court did not intend to adopt the federal standard for population deviation as the test under the Kentucky Constitution. The *Fischer II* Court stated, "[I]t is safe to say that so long as the maximum population deviation does not exceed −5 [percent] to +5 [percent], and provided any such deviation is in furtherance of state policy, no violation of the Constitution of the United States will be found."[33] This assertion merely recognizes that the 5 percent deviation rule can be reconciled with federal law, which considers overall deviations of less than 10 percent as constitutionally insignificant and which acknowledges the integrity of political subdivisions as a rational state policy.[34] As a general rule, federal courts find a state reapportionment plan presumptively constitutional when it achieves less than a 10 percent overall population deviation between the least and most populous districts.[35]

We decline the LRC's invitation to embrace the federal standard for Kentucky because the 5 percent rule appropriately ensures population equality. For purposes of Section 33 of the Kentucky Constitution, the 5 percent rule remains the standard to judge the constitutionality of population deviation in redistricting plans. But recognizing that "great difficulty and delicacy attends the performance of the duties imposed upon the General Assembly by [S]ection 33 of the Constitution,"[36] our decisions have long held that Section 33 does not demand mathematical perfection from the General Assembly. As Kentucky's highest court expressed in *Stiglitz*, "Exactitude is not to be expected. Approximation is the rule erected by the Constitution, but the [l]egislature may not escape the duty of approximation imposed by the Constitution on the ground that mathematical precision is not attainable."[37] To achieve approximate population equality, the *Fischer II* Court established that "population equality under Section 33 may be satisfied by a variation which does not exceed −5 [percent] to +5 [percent] from an ideal legislative district."[38] This remains an appropriate test to determine whether a legislative redistricting plan achieves approximate population equality.[39]

We take this opportunity to explain that the 5 percent rule is not an absolute mandate by which any population deviation greater than 5 percent from the ideal district is automatically unconstitutional. Rather, complying with the 5 percent deviation rule presumptively satisfies the pop-

---

**33.** *Fischer*, 879 S.W.2d at 478 (citations omitted).

**34.** *Mahan v. Howell*, 410 U.S. 315, 329, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973).

**35.** *Brown v. Thomson*, 462 U.S. 835, 842–43, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983) (citations omitted).

**36.** *Stiglitz*, 40 S.W.2d at 321.

**37.** *Id.* at 319; *see also Ragland*, 100 S.W. at 869 ("If exactness cannot, from the nature of things, be attained, then the nearest practica-ble approach to exactness ought to be made.").

**38.** *Fischer*, 879 S.W.2d at 479.

**39.** Kentucky is not the only state to adopt a 5 percent test. The North Carolina Supreme Court also requires "any deviation from the ideal population for a legislative district shall be at or within plus or minus five percent for purposes of compliance with federal 'one-person, one-vote' requirements." *Stephenson v. Bartlett*, 355 N.C. 354, 562 S.E.2d 377, 397 (2002).

ulation equality requirement of Section 33 of the Kentucky Constitution. A population variance of plus-or-minus 5 percent from the ideal is a minor deviation from mathematical equality, which enjoys a presumption of population equality. So a population deviation within this range alone is insufficient to make out a prima facie case of unconstitutionality. The legislature will not be required to justify the disparity in its reapportionment plan on this evidence alone. That is not to say it is impossible to prove a reapportionment plan is unconstitutional if it complies with the 5 percent rule. Staying within a 5 percent deviation from the ideal district is not a safe harbor. But the burden is on the plan's challenger to show it is arbitrary or discriminatory.

When a reapportionment plan exceeds the plus-or-minus 5 percent variance, the legislature has the burden of proving that the plan consistently advances a rational state policy. The Supreme Court stated in *Brown v. Thomson*,[40] "The consistency of application and the neutrality of effect of the nonpopulation criteria must be considered along with the size of the population disparities in determining whether a state legislative apportionment plan contravenes the Equal Protection Clause."[41] This is equally true with regard to Section 33 of the Kentucky Constitution. A rational state policy only justifies a population variance greater than 5 percent if it is both consistently applied throughout the redistricting plan and has a neutral effect.

There are also limitations to acceptable population variance. Redistricting plans cannot pursue other rational policies at the total expense of population equality. This would violate Section 33 of our Constitution and the Equal Protection Clause of the Fourteenth Amendment. For example, a redistricting plan that divides no counties but results in large population inequality would be unconstitutional. When districts exceed plus-or-minus 5 percent population variance from the ideal district, the ultimate question is whether the plan consistently advances a rational state policy and, if so, whether the population disparities among the districts that have resulted from the pursuit of this plan exceed constitutional limits.

■ We find that House Bill 1 does not comply with the *Fischer II* 5 percent rule because at least one district in both the House and Senate exceeds 5 percent population deviation from the ideal district. So the appellees have made a prima facie case that the Bill is unconstitutional, and the burden lies with the LRC to show the reapportionment plan consistently advances a rational state policy.

The LRC argues that the House reapportionment plan exceeds the federal 10 percent rule in order to prevent division of LaRue County.[42] Aside from the fact that the 5 percent rule applies, the policy of preserving county integrity is not consistently applied throughout the reapportionment plan as a whole. Neither the House nor the Senate reapportionment plan divides the fewest number of counties mathematically possible. Other plans in the record achieve greater population equality than House Bill 1 while dividing the fewest number of counties. The existence of alternative conforming plans is not sufficient to establish that House Bill 1 is unconstitutional. But their existence does show that the greater population inequality in the present plan is not a necessary consequence of pursuing county integrity. So the population deviations of 5.38 percent and 5.52 percent in House Bill 1 cannot

---

**40.** 462 U.S. 835, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983).

**41.** *Id.* at 845–46, 103 S.Ct. 2690.

**42.** The overall population deviation of the House redistricting plan is. 10.00132873 percent.

reasonably be said to advance the policy of maintaining county integrity. Because the LRC has advanced no other rational state policy, it fails to overcome the presumption of unconstitutionality. So House Bill 1 violates Section 33 because it does not achieve sufficient population equality.

Finally, the LRC argues the 5 percent rule of *Fischer II* is flawed because "it requires every Kentucky reapportionment plan to begin the decade at the maximum population deviation permitted by federal constitutional law." It complains that by starting out with a variance of −5 percent to +5 percent, the population among the districts quickly becomes malapportioned.[43] We do not read the *Fischer II* Court's interpretation so strictly.

In *Fischer II*, the challenged Senate redistricting plan divided 19 counties and achieved a population deviation range of −3.26 percent to +3.09 percent.[44] An alternative plan in evidence divided fourteen fewer counties by increasing the population deviation range by 3.18 percent.[45] The increase would have resulted in a population deviation of −4.74 percent to +4.79 percent, which complies with the plus-or-minus 5 percent rule.[46] Similarly, the challenged House districts contained a population deviation range within plus-or-minus 5 percent of the ideal district but divided 48 counties.[47] An alternative House redistricting plan would have in-

creased the population deviation range by .04 percent[48] but divided 19 fewer counties.[49] Under these circumstances, we held that "[t]he mandate of Section 33 is to make full use of the maximum constitutional population variation as set forth herein and divide the fewest possible number of counties."[50]

Redistricting plans need not start at the maximum population deviation of 5 percent as long as they divide the fewest number of counties possible. The General Assembly must divide the smallest number of counties necessary to comply with the 5 percent rule. But dividing the fewest number of counties while achieving greater population equality fully complies with Section 33 of the Kentucky Constitution.

## III. THE DISTRICTS FROM THE 2002 REAPPORTIONMENT PLANS MUST REMAIN IN PLACE FOR THE UPCOMING ELECTIONS.

The LRC asks this Court to dissolve the trial court's temporary injunction because it is predicated upon an erroneous conclusion of law. On February 17, 2012, this Court entered an order denying this same request in the LRC's motions to stay enforcement and seeking interlocutory and emergency relief. We now reiterate that the LRC's motions to dissolve the temporary injunction are denied.[51] Until the

---

43. Although the LRC complains of starting a decade with a population variance of −5 percent to +5 percent, House Bill 1 would create a variance of −5 percent to +5.38 percent in the House and −5 percent to +5.52 percent in the Senate.

44. *Fischer*, 879 S.W.2d at 476.

45. *Id.*

46. *Id.*

47. *Id.*

48. The increased population deviation would have still complied with the plus-or-minus 5 percent rule.

49. *Id.*

50. *Id.* at 479.

51. Appellees argued below that the LRC does not have standing to seek interlocutory relief because it is not "adversely affected" by the injunction, as required under CR 65.07. The LRC intervened in the trial court only to defend the constitutionality of House Bill 1. And neither it nor any member of the legislative branch was enjoined by the trial court's

General Assembly passes redistricting legislation that complies with Section 33 of the Constitution, the terms of the injunction entered by the Franklin Circuit Court remain in place. This means that the 2012 elections will be conducted using the districts as enacted in the 2002 Ky. Acts and codified in KRS 5.200, et seq.

The LRC argues that it is inappropriate to hold the upcoming 2012 elections using the 2002 districts because they violate Section 33 of the Kentucky Constitution. According to the LRC, House District 60, under the 2002 reapportionment plan, deviates from the ideal House district by 42.7 percent; and Senate District 11 deviates from the ideal Senate district by 22.2 percent. Instead, the LRC posits that the districts established by House Bill 1 should take effect until the General Assembly passes new redistricting legislation. Although we do not doubt the LRC's population deviation numbers among the 2002 districts, these are the only legislative districts capable of implementation at this juncture.

As an unconstitutional statute, House Bill 1 is null and void. The Bill no longer exists and cannot be implemented. Subject to exceptions that are inapplicable here,

[t]he general rule is that an unconstitutional statute, whether federal or state, though having the form and name of law, is in reality no law but is wholly void and ineffective for any purpose. Since unconstitutionality dates from the time of its enactment and not merely from the date of the decision so branding it, an unconstitutional law, in legal contemplation, is as inoperative as if it had never been passed and never existed; that is, it is void *ab initio*.[52]

We recognized as much in *Int'l Harvester Co. of Am. v. Commonwealth*[53] when we stated that "as a general rule, . . . a decision by a court of last resort that a statute is unconstitutional has the effect [of] rendering such statute absolutely null and void from the date of its enactment[ ] and not from the date on which it is judicially declared unconstitutional."[54]

Although we have not clearly enunciated this rule in our redistricting precedent, our decisions have been consistent on this point. In *Ragland*, the appellants argued that if the redistricting plan of 1906 was found unconstitutional, then the existing 1893 Act must also be declared so because it created unequal representative districts.[55] The high court rejected this contention, stating that the "[A]ct of 1893 has

---

temporary injunction. Only the Secretary of State and Board of Elections were enjoined, and they both opposed the LRC's motion for interlocutory relief for reasons discussed below. Rather than deciding whether the LRC has standing to seek relief under CR 65.07, we denied its motion on the merits and proceeded to hear arguments on the appeal from the trial court's final judgment. In an effort to address the substance of the trial court's judgment, we again decline to address the standing issue in our discussion of why the temporary injunction must remain in place.

**52.** 16A Am.Jur.2d *Constitutional Law* § 195 (citations omitted); *See also* 16 C.J.S. *Constitutional Law* § 208 (An unconstitutional "statute is not a law, has no existence, is a nullity,

or has no force or effect, or is inoperative. An act that has been declared unconstitutional is, in legal contemplation, as inoperative as though it had never been passed or written[;] and it is regarded as invalid, or void, from the date of enactment (not only from the date on which it is judicially declared unconstitutional), and at all times thereafter.") (footnotes omitted).

**53.** 170 Ky. 41, 185 S.W. 102 (1916) (*overruled on other grounds by Commonwealth ex rel. Dummit v. Jefferson County*, 300 Ky. 514, 189 S.W.2d 604 (1945)).

**54.** *Id.* at 103 (citation omitted).

**55.** 100 S.W. at 870.

gone into effect[;] and the government has been organized under it. To hold it void would be to throw the government into chaos[,] and this no court is required to do. It is now too late to question its validity." [56] The Court did not leave the unconstitutional 1906 law in effect.

The *Stiglitz* court upheld the trial court's ruling that the 1930 redistricting plans were unconstitutional and void.[57] "The necessary result" was to reinstate the redistricting plan of 1918, which the high court held would "continue in force until the [l]egislature enact[ed] a law in compliance with [S]ection 33 of the Constitution." [58]

And, in *Fischer II*, the trial court had not enjoined the 1991 redistricting plan, which it found constitutional.[59] This Court found the plan unconstitutional. But during the appeal of the lower court's decision, the election machinery progressed under the 1991 Act. So immediate effectiveness of the Court's opinion, finding the Act unconstitutional, "would disrupt the orderly process" of the 1994 elections.[60] To prevent this disruption and to avoid leaving in effect an unconstitutional law, we postponed the effective date of the decision until after the 1994 elections.[61] So the 1991 reapportionment Act was not deemed unconstitutional, void, and invalid until after the elections.

Unlike *Fischer II*, the interest of an efficient election process does not compel us to postpone the effective date of our opinion or dissolve the trial court's temporary injunction. Here, the trial court enjoined the Secretary of State and Board of Elections from implementing the districts established under House Bill 1. While the LRC pursued appellate relief, the 2012 elections proceeded under the districts established by the 2002 redistricting plan, not under the unconstitutional 2012 reapportionment plan. To reverse course now "would disrupt the orderly process" [62] of the upcoming elections. The Secretary of State asserts that enormous problems would arise in administering the May 22, 2012, primary elections if conducted under House Bill 1.

According to the Secretary of State's brief, February 27, 2012, was the deadline by which she was required to certify to all 120 county clerks the name, place of residence, and party affiliation of each candidate running in the 2012 primary election. Were this Court to order implementation of the districts drawn by House Bill 1, the Secretary asserts she would be required to recertify the candidates and conduct another drawing for ballot positions. And the Secretary of State asserts on brief that many counties would likely require substantial time to redraw precinct boundaries, transfer voter registration records, and notify voters of precinct changes. The Secretary of State also suggests that the filing deadline would have to be extended again to ensure candidates have time to withdraw, obtain the necessary signatures, and re-file in the appropriate district according to the new plan. So not only is House Bill 1 void *ab initio*, practically speaking, it is now too late to conduct the 2012 elections under the Bill's districts.

▮▮▮ "[I]t is within the province and the power of the courts to declare void and ineffective for any purpose all [A]cts of the General Assembly in violation of an ex-

56. *Id.*

57. 40 S.W.2d at 320.

58. *Id.*

59. 879 S.W.2d at 476.

60. *Id.* at 480.

61. *Id.*

62. *Id.*

press provision of the Constitution."[63] The trial court properly found House Bill 1 unconstitutional and enjoined the Secretary of State from implementing the districts contained in the Bill. And despite the resulting temporary imbalanced representation, ensuring the orderly process of the 2012 elections requires the 2002 redistricting plan remain in effect, as ordered by the trial court.

### IV. CONCLUSION.

House Bill 1 violates Section 33 of the Kentucky Constitution because it does not achieve sufficient population equality or preserve county integrity. The Kentucky House of Representatives and Kentucky Senate redistricting plans fail to divide the fewest number of counties mathematically possible. Each plan also contains at least one district with a population deviation greater than 5 percent from the ideal district. And the LRC has not carried its burden of proving the excessive population deviation is a result of a consistently applied rational state policy. House Bill 1 is null and void; and to ensure the orderly process of the upcoming elections, we will not dissolve the injunction entered by the trial court.

For the foregoing reasons, we affirm the judgment of the trial court and remand this case to the trial court with directions to enjoin permanently the conduct of any election under the district boundaries established under House Bill 1.

MINTON, C.J.; ABRAMSON, CUNNINGHAM, NOBLE, SCHRODER, and VENTERS, JJ., sitting.
CUNNINGHAM, NOBLE, SCHRODER, and VENTERS, JJ., concur.
ABRAMSON, J., concurs but thinks the discussion of the election calendar is solely informational given that House Bill 1 is

unconstitutional and the election was already proceeding under the 2002 Act. SCOTT, J., not sitting.